PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

SYLVESTER EMERSON WILLIAMS,
Plaintiff-Appellant,

v.

CLARENCE BENJAMIN, Captain, Lieber

Correctional Institution; SHIRLEY J.
TOMLIN, Lieutenant, Lieber
Correctional Institution,
Defendants-Appellees.

No. 94-7122

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
G. Ross Anderson, Jr., District Judge.
(CA-93-2874-2-3BC)

Argued: October 31, 1995

Decided: March 6, 1996

Before HAMILTON, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge
Motz wrote the opinion, in which Judge Michael joined. Judge Hamil-
ton concurred in the judgment and wrote a separate concurring opin-
ion.

_____

COUNSEL

ARGUED: W. Gaston Fairey, FAIREY, PARISE & MILLS, P.A.,
Columbia, South Carolina, for Appellant. Isaac McDuffie Stone, III,

LEWIS, REEVES & STONE, Columbia, South Carolina, for Appellees. **ON BRIEF:** Rochelle L. Romosca, J. Christopher Mills, FAIREY, PARISE & MILLS, P.A., Columbia, South Carolina, for Appellant. Amy Dare Lohr, LEWIS, REEVES & STONE, Columbia, South Carolina, for Appellees.

_____

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal involves a prisoner's claim that correctional officers violated his constitutional rights when they sprayed him with mace, confined him in four-point restraints on a bare metal bed frame and, while refusing to allow him to wash off the mace, continued the confinement for more than eight hours, without providing him the benefit of medical care or the use of a toilet.

I.

In his pro se complaint and in an affidavit filed in support of his claim, Sylvester Emerson Williams, an inmate at the Lieber Correctional Institution in Ridgeville, South Carolina, related the following facts. On December 27, 1991, defendant Shirley J. Tomlin, a Lieber correctional officer, became involved in a disagreement with inmate James Pleskac, who was confined, like Williams, in the administrative segregation unit. Williams heard Tomlin threaten to mace Pleskac. Along with Pleskac and five other inmates, Williams protested this threat by throwing water out of his cell's food service window. Tomlin ordered the inmates to stop and then ordered Williams to remove his arm from the food service window. When Williams asked why, Tomlin instructed another correctional officer to spray mace at Williams, hitting him in the chest and face. The other inmates involved in the incident were also maced.

As the defendant officers concede, once the inmates were maced, all "immediately ceased there (sic) actions." Williams at once began "hollering in pain from the burning of the mace," and "pleaded with Lt. Tomlin for a shower." Tomlin refused, allegedly informing Wil-

2

liams, "you will not get a shower today." Tomlin then "locked [Williams'] food service window and turned off all the water in [his] cell."**1**

Ten minutes later, defendant Captain Clarence Benjamin approached Williams' cell with a "strange looking gun" and ordered Williams to come to the food service window. Williams complied and without incident was placed in handcuffs. The other inmates were similarly handcuffed without resistance or protest. As Williams was being cuffed, he again asked to be allowed to wash the mace from his eyes, face, and body. Benjamin refused the request, responding that the mace was "your [Williams'] problem."

Benjamin instructed other officers to take everything, including Williams' bed mattress, out of his cell. He then ordered three officers to place Williams in four-point restraints on the metal bed frame. This involved securing Williams to the metal bed frame with handcuffs attached to his wrists and leg shackles attached to his ankles, so that Williams was immobilized. While officers placed Williams in the restraints, he "pleaded" with Benjamin for medical attention and for a shower because his skin and eyes were burning from the mace. Benjamin responded, "there's nothing wrong with you." After Williams was secured in the four point restraints, his cell door and window were again locked. The other inmates were also secured, without incident, in four-point restraints. Williams and the other inmates were kept in four-point restraints continuously for the next eight hours. (The record is silent as to any other facts concerning the confinement of the other inmates.)

During his eight-hour confinement, Williams was not permitted to wash the mace from his eyes, face, or skin. He was "never provided any opportunity to use the toilet during the entire time." Furthermore, he "was forced to inhale chemical munitions fumes" from the mace

_____

**1** A solid metal door secures each of the individual cells; this door contains a food service window, which is covered by vertical bars, with a horizontal opening at the bottom of the window. The opening is large enough to slide food trays through without having to open the cell door. The food service window also has its own metal door. Once the smaller food service door is closed, an inmate is completely "sealed" within his cell. Throwing liquid or objects outside of the cell is no longer possible.

3

and was not "checked by medical [personnel] during the hours [he] was restrained." Williams' "body felt as if it was on fire because of the chemical fumes," which caused "intense pain and suffering the whole time he was chained to the bed." Williams alleges that he "suffered with great difficulty and immense pain while inhaling the chemical munitions." The mace caused "intense pain and burning of the eyes." Only after he had suffered in this manner for eight hours was Williams "given a shower and medical attention."

The defendant prison officials acknowledge that Williams was maced and confined in four-point restraints on a bare steel bed frame for more than eight hours. They offer no evidence to dispute Williams' assertions that he asked for and was denied an opportunity to wash himself, that mace fumes were not fumigated from his cell, and that he was never permitted to use a toilet. However, the prison officials assert that Williams (and the other inmates confined in the same manner) precipitated the macing and confinement by throwing cups of unidentified foul-smelling liquids at Tomlin and another officer. The defendants further assert that in accordance with a written South Carolina Department of Corrections (SCDC) policy, the prison's medical director authorized the use of four-point restraints, a nurse checked to determine that the restraints were applied properly, and a corrections officer monitored the restrained inmates every fifteen minutes.

In his pro se complaint, after outlining the above factual allegations, Williams alleged that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment and his right under the Fourteenth Amendment not to be deprived of liberty without due process. The defendants filed an answer, denying, inter alia, that "any constitutional rights of the Plaintiff ha[d] been violated." The defendants then moved for summary judgment, based entirely on the argument that Williams' complaint failed to state a cause of action under the Eighth Amendment. In response to that motion, Williams filed an affidavit in which he detailed the above factual assertions under oath.

The magistrate judge recommended that summary judgment be granted to defendants. First, with regard to the Eighth Amendment claim, he found Williams'"claim of unnecessary or excessive force

4

[was] simply not supported by any evidence in the record." Second, the magistrate judge concluded that Williams' allegation that the four-point restraints were imposed in violation of the SCDC policy, even if true, failed to establish a Due Process claim. The district court adopted the magistrate judge's report and recommendation and granted summary judgment to the defendants.

II.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned. Determination of whether the Eighth Amendment has been violated requires analysis of subjective and objective components. See Wilson v. Seiter , 501 U.S. 294, 302 (1991). Specifically, Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component). What must be established with regard to each component "varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992).

For example, when an inmate claims that prison officials failed to provide him with adequate medical care or that conditions of confinement constitute cruel and unusual punishment, he must demonstrate that prison officials acted with "deliberate indifference" in order to state an Eighth Amendment claim. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). In both of these situations, the subjective component requires proof of more than mere negligence but less than malice. This standard is appropriate because "the State's responsibility to provide inmates with medical care [or decent living conditions] ordinarily does not conflict with competing administrative concerns." Hudson, 503 U.S. at 6. However, when an inmate claims, as Williams does here, that prison officials used excessive force on him, he is forced to meet a higher standard to establish the subjective component. Officials are entitled to use appropriate force to quell prison disturbances. Because officials must act "in haste, under pressure, and frequently without the luxury of a second chance," deliberate indifference is not a sufficiently rigorous standard. Whitley v. Albers, 475

5

U.S. 312, 320 (1986). Rather, in these circumstances, in order to make out an Eighth Amendment claim, a prisoner must demonstrate that officials applied force "maliciously and sadistically for the very purpose of causing harm." Id. at 320-21 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033 (1973)).

Although an inmate asserting an excessive force claim is thus required to meet this more demanding standard with regard to the subjective component of Eighth Amendment analysis, the objective component of an excessive force claim is less demanding than that necessary for conditions-of-confinement or inadequate medical care claims. This is so because the objective component of all Eighth Amendment claims is "contextual and responsive to `contemporary standards of decency.'" Hudson, 503 U.S. at 8 (quoting Estelle, 429 U.S. at 103). Since "routine discomfort" is part of prison life and "society does not expect that prisoners will have unqualified access to health care," in order to demonstrate the objective component of conditions-of-confinement or medical care claims prisoners must demonstrate "extreme" deprivations or neglect of "serious" medical needs. Hudson, 503 U.S. at 8-9. In contrast, when, as here, a prisoner asserts that officials have "maliciously and sadistically use[d] force to cause harm, contemporary standards of decency always are violated." Id. at 9 (emphasis added). A prisoner, like Williams, asserting malicious and sadistic use of force need not show that such force caused an "extreme deprivation" or "serious" or "significant" pain or injury to establish a cause of action. Id. All that is necessary is proof of more than de minimis pain or injury. Id.

The defendant officers' entire Eighth Amendment argument is directed at the subjective component; they maintain that "their conduct could not be characterized as an `unnecessary and wanton infliction of pain' in derogation of the Eighth Amendment." The officers do not assert that Williams' pain was not significant enough to satisfy the minimal standard necessary to meet the objective component of Eighth Amendment analysis. They do question the amount of pain Williams suffered, but only as it relates to the subjective component of the analysis. Thus, for present purposes, they apparently concede that there is at least an issue of fact with regard to the objective component. This concession appears wise. Mankind has devised some tor-

6

tures that leave no lasting physical evidence of injury.**2** Indeed, we have specifically recognized that the objective component can be met by "the pain itself," even if an inmate has no "enduring injury." Norman v. Taylor, 25 F.3d 1259, 1263 n.4 (4th Cir. 1994) (en banc), cert. denied, 115 S. Ct. 909 (1995). See also, Jordan v. Gardner, 986 F.2d 1521, 1526, 1546 (9th Cir. 1993) (en banc) (majority and dissent agree that psychic pain female prisoners suffer when subjected to cross-gender pat down search satisfies objective component). In any event, because the officers do not contest the objective component, but instead direct their attention to the subjective justification for the use of force, we do not further address the issue. See Shakka v. Smith, 71 F.3d 162, 167 n.3 (4th Cir. 1995) ("We do not address the objective component of the Eighth Amendment analysis because it appears that the prison officials have conceded for the purposes of this appeal that the evidence is sufficient to create a question of fact on this issue.")**3**

Turning then to the subjective component, the Supreme Court has directed that several factors should be balanced in determining whether prison officials acted maliciously and sadistically. These factors, set out originally in Whitley v. Albers , 475 U.S. 312 (1986), include:

> [1] the need for application of force, [2] the relationship between that need and the amount of force used,[3] the threat "reasonably perceived by the responsible officials," and [4] "any efforts made to temper the severity of a forceful response."

Hudson, 503 U.S. at 7 (citations omitted). The absence of serious injury is a relevant, but not dispositive, additional factor to be consid-

_____

**2** For this reason, courts should be wary of finding uses of force that inflict "merely" pain but not injury to be de minimis, and therefore beyond requiring justification under the Eighth Amendment.
**3** Moreover, because the officers did not move for summary judgment on the ground that Williams had failed to satisfy the objective component, Williams was under no obligation to come forward in response with evidence to show that he had suffered sufficient pain or injury to satisfy that component. See Jones v. Owens-Corning Fiberglas Corp., 69 F.3d 712, 719 n.7 (4th Cir. 1995).

7

ered in the subjective analysis. Id. With these "Whitley factors" in mind, we examine each application of force in turn.

A.

The first application of force was, of course, the deployment of mace. The defendant officers maintain that the use of mace was justified because Williams and the other inmates threw unidentified foul-smelling liquids at them, creating a health risk. The district court appeared to rely on this argument when it "determine[d] that Defendants' actions were necessary to protect them and the prisoners from health risks associated with the Plaintiff's conduct." Williams correctly points out that in considering whether the defendants are entitled to summary judgment, the court cannot accept as true defendants' version of the facts (the inmates threw "foul-smelling liquids" at the guards) -- but must accept as true Williams' version (the inmates threw water at the guards). See, e.g. , Shakka, 71 F.3d at 165. Nevertheless, by Williams' own account, the inmates threw water at Tomlin and refused to obey the command to desist. Applying the first Whitley factor, the guards' decision to use some force to quell the disturbance was justifiable.

When the guards' "reasonable perception" of the threat posed by the prisoners is examined (the third factor in the Whitley analysis) it is more evident that some use of force was justified. Tomlin and the other guards perceived that they were targets of foul-smelling liquids. It is certainly not unknown for inmates to throw waste products at their jailors. See, e.g., LeMaire v. Maass, 12 F.3d 1444 (9th Cir. 1993). Hence, even accepting Williams' version of the events, the guards' perception that the inmates were throwing "foul" liquids was reasonable, and they could reasonably perceive such conduct as posing a more significant threat.

Analysis of the second and fourth Whitley factors is more complicated. It is generally recognized that "it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984), cert. denied, 470 U.S. 1085 (1985). For this reason, we have closely scrutinized the use of tear gas or mace (a trade name for tear

8

gas, Soto, 744 F.2d at 1261) in correctional facilities. See, e.g., Bailey v. Turner, 736 F.2d 963 (4th Cir. 1984); Greear v. Loving, 538 F.2d 578 (4th Cir. 1976). This is because, even when properly used, such weapons "possess inherently dangerous characteristics capable of causing serious and perhaps irreparable injury to the victim." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984), cert. denied, 470 U.S. 1035 (1985). Accordingly, although it is not per se unconstitutional for guards to spray mace at prisoners confined in their cells, it is necessary to examine the "totality of the circumstances, including the provocation, the amount of gas used, and the purposes for which the gas is used [to] determin[e] the validity of the use of tear gas in the prison environment." Bailey, 736 F.2d at 969. See also, Justice v. Dennis, 834 F.2d 380, 383 (4th Cir. 1987) (en banc), vacated on other grounds, 490 U.S. 1087 (1989).

However, mace can be constitutionally used in small quantities to "prevent riots and escapes" or to control a"recalcitrant inmate." Landman v. Peyton, 370 F.2d 135, 138 & n.2 (4th Cir. 1966), cert. denied, 388 U.S. 920 (1967). See also Bailey , 736 F.2d at 968-69. A limited application of mace may be "much more humane and effective than a flesh to flesh confrontation with an inmate." Soto, 744 F.2d at 1262. Moreover, prompt washing of the maced area of the body will usually provide immediate relief from pain. Id. Furthermore, because a limited use of mace constitutes a relatively "mild" response compared to other forms of force, the initial application of mace indicates a "tempered" response by the prison officials. Thus, on balance, analysis of the second and fourth Whitley factors also leads us to conclude that the district court did not err in deciding, as a matter of law, that the initial application of mace did not constitute cruel and unusual punishment.

B.

Ten minutes after the macing, officers placed Williams in four-point restraints. In our civilized society, we would like to believe that chaining a human being to a metal bed frame in a spread-eagled position would never be necessary. Unfortunately, it sometimes is. Courts have thus approved the limited use of four-point restraints, as a last resort, when other forms of prison discipline have failed. See, e.g., Stenzel v. Ellis, 916 F.2d 423, 428-29 (8th Cir. 1990).

9

The need here for the initial imposition of four-point restraints is not as evident as was the need for the initial application of mace. The defendant officers acknowledge that, upon being maced, all "inmates immediately ceased there [sic] actions." Arguably, with the food service windows closed and the inmates sealed in their cells, the guards could no longer reasonably perceive any threat from Williams or the other inmates and, thus, the imposition of the restraints was not necessary.

Nevertheless, the Supreme Court has explained that the necessity of the guards' actions is not the proper focus of inquiry. Whitley, 475 U.S. at 319. Instead, we focus on whether the evidence supports the inference that the guards wantonly punished Williams. Id. at 322. The guards' decision to impose the restraints, in itself, does not support such an inference. When the officers decided to confine Williams in the restraints, only minutes had elapsed since the disturbance had begun, Williams was still "hollering," and it was not obvious that the disturbance had ended. In view of these undisputed facts, we cannot conclude that there was no "need" for the application of force or that the guards were unreasonable in their apparent belief that the imposition of four-point restraints was necessary to obtain "order and control." Furthermore, although closing the food service windows may have been all that was necessary to stop the inmates from throwing liquids outside their cells, inmates cannot be allowed to dictate whether their cell windows remain open or closed.

Analysis of the second and fourth Whitley factors--whether the imposition of four-point restraints was rationally related to the need for force and evidenced any effort to "temper" the severity of the response--also indicates that the decision to apply the restraints, standing alone, does not suggest a malicious or sadistic intent. Such restraints undoubtedly pose a significant threat of physical injury. See, e.g., Washington v. Harper, 494 U.S. at 226-27 ("Physical restraints . . . can have serious physical side effects when used on a resisting inmate . . . ."). However, imposition of such restraints is seemingly a not uncommon "next" step, if verbal commands, show of force, and mace, are ineffective in controlling prisoners.

For these reasons, we cannot conclude that the initial decision to impose four-point restraints, in itself, evidenced a sadistic or malicious intent to punish Williams.

10

C.

We are thus left to consider the most difficult issue, whether confining Williams in four-point restraints for eight hours, without permitting him to wash off the mace, use a toilet or receive medical attention, could constitute an Eighth Amendment violation. The officers do not claim that Williams (or the other inmates who were also restrained for eight hours) did <u>anything</u> once confined in the four-point restraints that necessitated an application of force. They do not even assert that the inmates, while held in the restraints, verbally assaulted or threatened the guards.

Furthermore, as to the severity of Williams' pain or injury, while the officers point out that Williams did not suffer any documented medical injury as a result of his confinement, they do not offer any evidence to counter Williams' sworn statement that although he was "hollering with pain" and begging to be permitted to wash off the mace, they did not permit him to wash it off for more than eight hours.[4] A total of 5.5 grams of the mace (CS or o-chlorobenzylidene malonitrile) was sprayed into the cells. Although this does not sound like much, one medical text indicates that based on animal studies an "estimated lethal dose" of CS is "only" 6 grams. John B. Sullivan, Jr. & Gary R. Krieger, <u>Hazardous Materials Toxicology</u> 999 (1992). <u>See also</u>, <u>Spain v. Procunier</u>, 600 F.2d 189, 194 (9th Cir. 1979) (pharmacological expert testified that "tear gas can be lethal in the confines of a small cell"); Howard Hu & Preston Reynolds, <u>Tear Gas -- Harassing Agent or Toxic Chemical Weapon</u>, 262 JAMA 660 (1989).

In sum, on the present record, the only "need" for force and the only "threat" the defendants' perceived justifying the extended con-

_____

**4** Permitting a prisoner who has been maced to wash the chemical munitions out of his eyes is required by the policy governing the use of chemical agents in federal prisons. <u>Program Statement</u>, CPD 5566.04, Department of Justice, Federal Bureau of Prisons§ 10(d) (June 13, 1994) ("The eyes are to be flushed with cold water within five minutes of exposure, to ensure appropriate decontamination.") Moreover, the fact that prisoners were permitted to wash off mace shortly after its application has been a significant factor in upholding the use of mace. <u>See</u>, <u>e.g.</u>, <u>Soto</u>, 744 F.2d at 1266.

finement was that occasioned by the original throwing of liquids. They offer no evidence to dispute Williams' affidavit that his long confinement without being able to wash off the mace caused "immense" pain. Nevertheless, the defendants maintain that the decision to confine Williams for eight hours without permitting him to wash or to use the toilet was a constitutionally permissible "exercise of official discretion." Maybe so. Certainly we afford prison administrators "discretion" to determine what is necessary for the "prison's internal security." Whitley, 475 U.S. at 319. Moreover, when, as here, prison administrators initially apply force in a good faith effort to maintain discipline, "[h]ow long restraint may be continued calls for the exercise of good judgment on the part of prison officials." Williams v. Burton, 943 F.2d 1572, 1576 (11th Cir. 1991), cert. denied, 505 U.S. 1208 (1992). However, the Supreme Court has specifically reminded us that the "deference" that is afforded to prison administrators "does not insulate from review actions taken in bad faith and for no legitimate purpose." Whitley, 475 U.S. at 322. Deference to prison officials does not give them constitutional license to torture inmates. See Wilkerson v. Utah, 99 U.S. 130, 136 (1878).

It must be remembered that at this stage we are not called upon to determine whether there was sufficient evidence that the prison officials actually acted in bad faith or for no legitimate purpose. Instead, our present inquiry is whether the evidence, viewed in the light most favorable to Williams, supports a "reliable inference of wantonness in the infliction of pain." Whitley, 475 U.S. at 322. When the guards placed Williams in the restraints, he was allegedly screaming in pain as the mace "burned" his face. Once immobilized, Williams begged and pleaded for water to wash off the mace. The guards refused to wash off the mace or permit Williams to wash himself, informing him that he would not get a shower and that the mace was "his problem." Under Williams' version of the facts, no medical personnel checked on his condition and he was left helpless and in immense pain for eight hours.

Although great deference should be afforded prison officials, it is difficult to conceive of a legitimate purpose for refusing to allow Williams to wash and denying him medical attention, particularly when his confinement in restraints lasted for such an extended period of time. After the guards had imposed the restraints on the prisoners, the

12

immediacy of the disturbance was at an end. In such a circumstance, the unnecessary infliction of continued pain throughout a prolonged time period clearly supports an inference that the guards were acting to punish, rather than to quell the disturbance. See United States v. Cobb, 905 F.2d 784, 789 (4th Cir. 1990) ("[P]unitive intent behind a defendant's use of force may be inferred when the force is not reasonably related to a legitimate nonpunitive governmental objective.") (quotations omitted), cert. denied, 498 U.S. 1049 (1991).

The record at present contains no reason for the guards' refusal to permit Williams to wash, no evidence that Williams was not in the "immense pain" he alleges, and no justification for the extended period of time Williams was left in the restraints. The award of summary judgment on this record would create a harmful precedent. It would establish that whenever any inmate causes a disturbance by throwing water or something similar at a guard, and refuses to obey a further command, guards can--without fear of violating the Constitution--spray an inmate in the face with mace and then confine him in four-point restraints for an extended period of time without permitting him to wash or use the toilet, without fumigating the cell, and without allowing him the benefit of medical attention of any kind. Although the officers' conduct here may ultimately be held not to violate the Eighth Amendment, we are unable to rule that the record, at this juncture, viewed in the light most favorable to Williams, does not support a "reliable inference of the wanton infliction of pain." Whitley, 475 U.S. at 322.

The defendants' own arguments demonstrate why this is so. The defendant officers heavily rely on their asserted compliance with the South Carolina Department of Corrections (SCDC) Policy 1500.12, governing the use of four-point restraints, as evidence that they acted in good faith and without malice. Pursuant to Policy 1500.12:

> Mechanical restraints will never be applied as punishment and/or discipline, and will be used only as a precaution against escape prior to and during transfer; and to prevent inmate self-injury or injury to others.

. . .

13

Four-point restraints will be used only as a last resort to prevent harm or physical danger to him/herself or others, and then <u>only</u> upon the order/approval of a physician. Under no circumstances will such restraints be applied to enhance security of the facility, prevent escape from the facility, or for punishment. Restraints will be used no longer than the condition prevails, and the use of restraints beyond a period of four hours must be approved by the Chief Medical Physician for the Department or his/her medical staff designee. In addition to review by the prescribing physician, any inmate so restrained will be the subject of continuous monitoring during the period of restraint, and the need for restraint will be reevaluated at 15-minute intervals. A medical and observation log of such evaluations will be maintained.

(emphasis in original). (The above quotation is from the version of the Policy in effect at the time of this incident; it has been modified slightly, but not substantively, since that time.)

The officers maintain that (1) compliance with the Policy evidences their good faith and (2) the record establishes that they complied with the Policy. The officers' first point has merit. Policy 1500.12 is not, of course, a constitutional requirement and so compliance with it would not necessarily demonstrate that the defendants acted constitutionally.**5** Nevertheless, compliance with the Policy would provide powerful evidence that the application of force was tempered and that the officers acted in good faith in imposing the restraints. <u>Cf. Miller v. Leathers</u>, 913 F.2d 1085, 1088 (4th Cir. 1990) (guard's violation of regulations supports the "inference" of bad intent), <u>cert. denied</u>, 498 U.S. 1109 (1991).

_____

**5** For this same reason, even if the guards were found to have violated the Policy in all respects, this would not mean that Williams would automatically prevail on his Eighth Amendment claim. However, <u>if</u>, as Williams swears, the guards totally immobilized him, knowing that he was in pain and that he was physically vulnerable after the macing, and then left him for eight hours in that position, without medical care of any kind, it would strongly indicate that the guards sadistically and maliciously intended to cause Williams unnecessary pain and suffering.

14

The critical flaw in the officers' argument is in their second point. Their compliance with Policy 1500.12, rather than being uncontroverted, is hotly disputed. The officers argue that the use of four-point restraints for eight hours was authorized and supervised as required by the Policy. Williams swears that he received no medical attention until after the restraints were removed and, although the prison medical records provide some support for the defendants' arguments, they do not support their claim that the Policy was complied with in all respects. Most significantly, the officers insist, in their Answer to the complaint, that Williams' confinement in the restraints for a long period was necessary "to defend themselves from the danger imposed by the plaintiff." Williams claims the restraints were maintained to punish him (expressly forbidden by Policy 1500.12), and not imposed "as a last resort" to prevent escape, harm, or physical injury (as the Policy directs). Williams offered some evidentiary support for his claim that the four-point restraints were not employed as a "last resort" protection device: a memorandum authored by defendant Benjamin and dated September 10, 1991, just three months before the incidents at issue in this case. That memorandum directs that anytime an inmate throws a substance at an officer, "<u>immediately</u> and <u>without question</u>" the prison medical director is to be called for a "four-point restraining order" and that "[o]nce this order is obtained, <u>it must be adhered to</u> and the inmate must be placed in four-point restraints." (emphasis in original). In sum, the principal factual basis for the officers' argument that they acted in good faith--their compliance with the Policy--is in dispute. This severely undermines their position that summary judgment was proper.

Moreover, the legal authority that the officers cite, rather than supporting them, also indicates the inappropriateness of summary judgment at this time. The officers point to three cases in which appellate courts have held the application of four-point restraints for an extended period of time did not violate the Eighth Amendment. <u>See</u> <u>LeMaire v. Maass</u>, 12 F.3d 1444 (9th Cir. 1993); <u>Williams v. Burton</u>, 943 F.2d 1572 (11th Cir. 1991), <u>cert. denied</u>, 505 U.S. 1208 (1992); <u>Bruscino v. Carlson</u>, 854 F.2d 162, 164 (7th Cir. 1988), <u>cert. denied</u>, 491 U.S. 907 (1989). In addition to being factually distinguishable from the case at hand in important respects (e.g., none involved a plaintiff who was maced and not permitted to wash off the mace prior to imposition of a lengthy confinement in four-point restraints), there

15

is an even more fundamental reason why these cases do not assist defendants. The basis for all three decisions was an extensive factual record developed in the trial court.**6**

Critical to the appellate decision in each case was a wealth of evidence as to the dangerousness of the inmate-plaintiff or the entire population of the prison. Each appellate court heavily relied on this evidence to justify the need for the challenged extensive confinement and the reasonableness of the officers' perception of a threat from the inmate-plaintiffs. For example, in LeMaire, the record made in the district court contained "meticulously documented" evidence of the plaintiff's "numerous egregious violations of prison rules" including repeated brutal assaults on guards and other prisoners, which was found by the Ninth Circuit to justify his lengthy confinement in four-point restraints. LeMaire, 12 F.3d at 1447-49. Indeed, the Ninth Circuit specifically commented that it was "most impressed by the extensive prison records in this case documenting LeMaire's misconduct." Id. at 1462.

In Bruscino, the trial court held evidentiary hearings for nearly twenty-eight days, hearing testimony from "approximately ninety witnesses," and admitting "into evidence approximately 150 exhibits, which consisted of several thousand pages of material." Bruscino v. Carlson, 654 F.Supp. 609, 611 (S.D. Ill. 1987). Judge Posner, for the Seventh Circuit, twice noted the "extensive evidentiary hearings" and clearly relied on the record evidence of a "remarkable narrative of violence" to conclude that "[s]ince the principal victims of murders and armed assaults in Marion penitentiary are inmates, the procedures that the plaintiffs describe as cruel and unusual punishment are the very procedures that are protecting them from murderous attacks by fellow prisoners." Bruscino, 854 F.2d at 164-65. See also Williams, 943 F.2d at 1574 (upholding a lengthy confinement on the strength

_____

**6** Even when the Ninth Circuit vacated portions of the broad injunctive relief granted by the district court in LeMaire , it acknowledged not only its need to defer to the district court's factual findings but the importance of the factual record to its decision. 12 F.3d at 1450-51 ("[T]he district court has provided us with an excellent and complete factual record which permits us to decide this appeal based on recent clarification of the controlling law.").

16

of factual findings that during his incarceration the plaintiff had been convicted of eighty-four charges of violating prison regulations, including seventy-five major violations for "assault, failure to obey, threats, insubordination, intentionally creating a security hazard and inciting to riot.")

Similarly necessary to the holdings in LeMaire , Bruscino, and Williams was evidence that the prison officials, in subjecting the plaintiffs to lengthy confinement in four-point restraints, had complied with correctional regulations or otherwise provided the prisoners with adequate safeguards. In LeMaire, the Ninth Circuit upheld the use of four-point restraints only "when imposed in strict compliance with existing prison regulations." LeMaire , 12 F.3d at 1460. The appellate court "agree[d] with the district court's finding that the prison was not following these regulations" and so approved the district court's injunction to the extent it required"the prison's strict adherence to the regulations they have already established." Id. In Bruscino, Judge Posner particularly remarked upon the district court's finding that the restraints were maintained in accordance with "procedures that the prison adopted in the wake of a crescendo of violence." Bruscino, 854 F.2d at 164. Similarly important to the Eleventh Circuit in Williams was that "the record support[ed] the [district court's] decision that adequate precautions were taken to safeguard the prisoner's physical well being through constant monitoring and examinations by medical personnel." Williams, 943 F.2d at 1575.

Of course, we have no comparable evidentiary record. In granting summary judgment neither the magistrate judge nor the district court did or could weigh evidence or make findings of fact. Moreover, while Williams submitted an affidavit and several exhibits in opposing summary judgment, our review of the record indicates that the defendant officers offered no exhibits or affidavits in support of their motion. Thus the evidentiary record before the district court when it considered the defendants' summary judgment motion was sparse.**7**

_____

**7** The defendant officers seem to have recognized this deficiency-- albeit, too late. After the district court granted defendants summary judgment and after Williams had noted his appeal and filed his appellate brief, the defendants filed a motion in the district court to supplement the

17

When the record is further developed, it may be that Williams cannot prove that he was confined in the manner he alleges. It may be that there was a need for the force that was applied, that the officers reasonably perceived a continuing threat justifying it, that the extent and severity of the confinement were in keeping with the need for force, that the lengthy confinement was executed in a way that tempered its severity, and that the amount of mace used could not have caused immense pain. However, on this record we cannot so hold. At this juncture, the facts surrounding the eight hour confinement are heavily disputed. At present, the evidence as to Williams' lengthy confinement, while suffering the effects of the mace, when "viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." Whitley, 475 U.S. at 322. Accordingly, the grant of summary judgment on this Eighth Amendment claim was error.

III.

The remaining issue on appeal is whether summary judgment was properly granted on Williams' claim that his Due Process rights were violated. In his filings before the magistrate judge, Williams included an assertion that those rights had been violated when the defendants failed to comply with Policy 1500.12. Policy 1500.12 incorporated provisions of a federal consent decree (commonly referred to as the "Nelson Consent Decree") that the State had entered into to resolve an inmate class action suit. See Plyler v. Leeke , No. 82-876-2, 1986 WL 84459 (D.S.C. March 26, 1986). The magistrate judge concluded, without addressing whether the defendants had in fact violated the Policy, that "the use of four-point restraints or chemical munitions is not a violation of any federal law or statute. The mere fact that institutional policy sets forth standards for the use of these things does not provide a claim for relief under § 1983."

_____

record on appeal with evidence as to Williams' disciplinary history while at Lieber. The district court denied the motion. This evidence might well provide the basis for concluding that special measures were required to control Williams--even if his past conduct was not in the category of inmate LeMaire's. See LeMaire, 12 F.3d at 1447-49. However, Williams has been given no opportunity to challenge this evidence. Indeed, it was not even considered by the district court in granting summary judgment.

18

Although Williams' argument on this point is not absolutely clear, he apparently maintains that in violating Policy 1500.12 and necessarily the Nelson Consent Decree, the defendant officers violated both his substantive and procedural Due Process rights. As to his claim of a substantive due process violation, it is now well established that the Eighth Amendment "serves as the primary source of substantive protection to convicted prisoners," and the Due Process Clause affords a prisoner no greater <u>substantive</u> protection"than does the Cruel and Unusual Punishments Clause." <u>Whitley</u>, 475 U.S. at 327. Accordingly, Williams' substantive Due Process claim adds nothing to his Eighth Amendment claim.

His procedural due process claim cannot be disposed of as quickly. Williams apparently claims that Policy 1500.12 provided him with a liberty right to be free from punishment in four-point restraints and that, for this reason, the guards' violation of this Policy, without providing him any "process," constituted a violation of the procedural due process rights guaranteed by the Fourteenth Amendment. In response, the defendant officers do not argue that the Policy does not provide Williams with a liberty interest or that a violation of the Policy cannot provide the basis for a § 1983 claim. Instead, defendants' sole argument is that there has been no violation of the Policy. As explained above, the defendants are wrong in asserting that, on this record, it has been established that they complied with Policy 1500.12. Because a material dispute exists as to whether the officers violated the Policy, we must address Williams' claim that a violation of it (and the Nelson Consent Decree) provides the basis for a procedural due process claim.**8**

Williams relies on <u>Sandin v. Conner</u>, #6D 6D6D# U.S. ___, 115 S. Ct. 2293, 2300 (1995). There the Supreme Court reaffirmed its well-established holding that "States may under certain circumstances create liberty interests which are protected by the Due Process

_____

**8** Because Policy 1500.12 and the Nelson Consent Decree are in all material respects identical, we need not decide whether a consent decree, standing alone, can create a protected liberty interest. <u>See Kentucky Dep't of Corrections v. Thompson</u>, 490 U.S. 454, 465 n.5 (1989); <u>Slezak v. Evatt</u>, 21 F.3d 590, 595 n.5 (4th Cir.), <u>cert. denied</u>, 115 S. Ct. 235 (1994).

19

Clause." Nevertheless, the Court advised that state-created liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. (citations omitted). Williams has a forceful argument that confinement in four-point restraints poses an atypical and significant hardship. Total immobilization in the restraints surely "work[ed] a major disruption in his environment." Id. at 2301. Indeed, the limitations and protections in Policy 1500.12 and the consent decree demonstrate the "atypical and significant" nature of the imposition of the restraints.

Additionally, Williams has a forceful argument that Policy 1500.12 and the Nelson Consent Decree are written in "unmistakably mandatory" language and create an enforceable expectation on the inmate's part that he will not be placed in four-point restraints absent enumerated substantive predicates.[9] The regulations provide that four-point restraints will not be imposed except as a last resort to prevent harm, and with medical approval. To create a liberty interest, such mandatory language is required. See Washington v. Harper, 494 U.S. 210, 221 (1990). For the above reasons, Williams has a persuasive argument that the regulations create a protected liberty interest. We note merely that Williams' arguments are persuasive and forceful without deciding the issue, because even if we accept his position, he still cannot establish a procedural due process violation.

We decline to find a procedural due process violation in this case for several reasons. First, Williams has made no argument as to what sort of procedural protections were required. Second, the restraints were imposed in response to a disturbance. In such a circumstance, process is not possible.[10] See Lunsford v. Bennett, 17 F.3d 1574, 1583

_____

**9** Moreover, Policy 1500.12 does not implicate one of the concerns the Supreme Court mentioned in Sandin. There, the Court noted that the proliferation of alleged liberty interests based on the language of regulations worked to punish those prisons that (laudably) created regulations to control correctional officers' discretion. Sandin , 115 S. Ct. at 2299. In this case, the State did not adopt the Policy wholly of its own accord but as a result of a federal class action suit.

**10** This point gives us some pause as it relates to this case. Simply because the initial application of the restraints occurred soon after a dis-

20

(7th Cir. 1994) ("[P]redeprivation protections [cannot] reasonably be applied to a prison disturbance situation where institutional security is threatened."); Albers v. Whitley, 546 F.Supp. 726, 732 n.1 (D. Ore. 1982). Third, Williams has not even alleged that his post-deprivation state remedies were inadequate. Cf. Zinermon v. Burch, 494 U.S. 113, 126-30 (1990) (discussing significance of adequate state post-deprivation procedures); Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988). When, as here, it is not possible to provide full pre-deprivation procedural protections because of an emergency situation, there is particular reason for a federal court to conclude that post-deprivation state remedies adequately protect state-created liberty interests. Zinermon, 494 U.S. at 128 (explaining that in some circumstances, post-deprivation process is adequate where it is impracticable to provide pre-deprivation process). Accordingly, the district court did not err in granting the defendants summary judgment on Williams' Due Process claim.

IV.

In sum, we reverse and remand for further proceedings that portion of the district court's order granting summary judgment on Williams' claim that the officers violated the Eighth Amendment by retaining him in four-point restraints in a mace-filled cell for eight hours, without allowing him to wash off the mace or providing him with any medical care, or even the use of a toilet. We affirm in all other respects.

AFFIRMED IN PART
AND REVERSED AND REMANDED IN PART

HAMILTON, Circuit Judge, concurring in the judgment:

I concur in the court's judgment. I write further only to emphasize that on remand, in addition to examining the subjective component of

_____

turbance does not mean that four-point restraints may be imposed indefinitely. At some point in time, an inmate so restrained would be entitled to some procedural protection to ensure that his liberty interest was not being arbitrarily and capriciously denied. In this appeal, we decline to resolve where that point exists.

21

Williams' Eighth amendment claim based on his eight-hour confinement in light of a fully developed record, the district court is free to examine two additional issues not raised by the defendants: (1) whether Williams satisfied the objective component of his Eighth Amendment claim, and (2) whether the defendants are entitled to qualified immunity on this claim.

With respect to the first issue, in Norman v. Taylor, this court, sitting en banc, held that "absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is de minimis." 25 F.3d 1259, 1263 (4th Cir. 1994), cert. denied, 115 S. Ct. 909 (1995). Extraordinary circumstances are present when "the force used . . . [is] . .. of a sort repugnant to the conscience of mankind . . . or the pain itself [is] such that it can properly be said to constitute more than de minimis injury." Id. at 1263 n.4 (citations and internal quotation marks omitted).

In this case, the record is crystal clear that Williams suffered no injury from the defendants' actions. In particular, Williams' affidavit does not contradict the prison clinic's notes that he was "OK" after he was released from the four-point restraints. (J.A. 61). Further, Williams did not report back to the prison clinic until some two weeks after the incident, and his visit was for an unrelated reason. (J.A. 61). Therefore, because Williams suffered no injury, to prevail on his Eighth Amendment claim, he must show "that either the force used . . . [was] . . . of a sort repugnant to the conscience of mankind . . . or the pain itself [was] such that it can properly be said to constitute more than de minimis injury." Norman , 25 F.3d at 1263 n.4 (citations and internal quotation marks omitted).

The absence of briefing, argument, and a factual record bearing on the issue of whether this case meets the extraordinary circumstances exception recognized in Norman makes the objective component issue too difficult to resolve at this point. In any event, the issue is not properly before the court because the defendants' sole basis for seeking summary judgment was that Williams failed to establish the subjective component. See Jones v. Owens-Corning Fiberglas Corp., 69 F.3d 712, 719 n.7 (4th Cir. 1995) ("`When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B--a ground the movant might have presented but did

not[.]"') (quoting <u>Malhotra v. Cotter & Co.</u>, 885 F.2d 1305, 1310 (7th Cir. 1989)). But, of course, the defendants' failure to raise this ground below does not preclude them from raising it on remand. If the record is fully developed on this issue on remand, it may well be that summary judgment is appropriate on the basis that Williams failed to establish the objective component.**1**

As to the second issue, the question is whether, at the time of the defendants' actions, their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). In light of the line of authority upholding the application of four-point restraints for extended periods of time, <u>see, e.g.</u>, <u>Williams v. Burton</u>, 943 F.2d 1572, 1576 (11th Cir. 1991) (upholding the use of four-point restraints for a period of twenty-eight and a half hours), <u>cert. denied</u>, 505 U.S. 1208 (1992), it may well be that a reasonable officer would not have known that the defendants' actions would violate Williams' Eighth Amendment rights. But, for some reason, the defendants--as with the objective component issue--have not placed the defense of qualified immunity before the court, and of course, the district court will be free to visit this issue on remand should it arise.**2**

_____

**1** Contrary to the court's suggestion, the record does not reflect that the defendants "concede[d]" the existence of a material issue of genuine fact as to the objective component, <u>see ante</u> at 7-8; rather, the record reflects that the issue--for whatever reason--was never raised in the district court. From such facts, one cannot draw the conclusion that the issue was conceded, especially since <u>Norman</u> was decided after the defendants moved for summary judgment and no hearing was held on the motion. In any event, my comments here should not be construed as expressing an opinion as to the merits of whether Williams can satisfy the objective component.

**2** As with the objective component, I express no opinion as to the merits of the defendants' defense of qualified immunity.

23