**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-6687**

BILLY TEDDER,

> Plaintiff - Appellant,

v.

SGT. JOHNSON,

> Defendant – Appellee,

and

MARGRETT BELL, Associate Warden of Security; WARDEN ANTHONY
PADULA; DIRECTOR JOHN OZMINT, South Carolina Department of
Corrections,

> Defendants.

Appeal from the United States District Court for the District of
South Carolina, at Anderson.    J. Michelle Childs, District
Judge. (8:09-cv-03067-JMC)

Argued:  March 20, 2013                 Decided:  June 12, 2013

Before TRAXLER, Chief Judge, WYNN, Circuit Judge, and HAMILTON,
Senior Circuit Judge.

Reversed and remanded by unpublished opinion.   Chief Judge
Traxler wrote the opinion, in which Judge Wynn and Senior Judge
Hamilton joined.

Thomas Elwyn Davies, PUBLIC JUSTICE CENTER, Baltimore, Maryland, for Appellant.  Walker Heinitsh Willcox, WILLCOX BUYCK & WILLIAMS, PA, Florence, South Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

TRAXLER, Chief Judge:

Appellant Billy Tedder, an inmate at Lee Correctional Institution ("LCI") in Bishopville, South Carolina, filed this § 1983 action against Sergeant Henry Johnson, alleging that Johnson used constitutionally excessive force when Johnson pepper-sprayed him while Tedder was attempting to join LCI's "pill line" to receive his seizure medication. Johnson moved for summary judgment on several grounds: (1) that Tedder failed to exhaust his administrative remedies; (2) that the use of force against Tedder was reasonable; and (3) that he was entitled to qualified immunity. The district court concluded that a genuine issue of material fact existed on the exhaustion issue, but that Tedder failed to adduce sufficient evidence to establish a violation of his Eighth Amendment rights. Accordingly, the district court granted summary judgment in favor of Johnson. This appeal followed. We reverse the grant of summary judgment and remand for further proceedings.

I.

We recount the relevant facts in a light most favorable to Tedder who is the non-moving party. See, e.g., Robinson v. Clipse, 602 F.3d 605, 607 (4th Cir. 2010). Tedder, who is serving a life sentence in a minimum security unit at LCI, has been in the custody of the South Carolina Department of Corrections ("SCDC") since the 1980s. During this 20-plus year

3

period, Tedder accrued three disciplinary citations classified as "assaultive."[*] There are numerous other charges listed in Tedder's disciplinary record, but these are classified as "non-assaultive disciplinaries"—presumably infractions that were relatively minor. J.A. 77.

Tedder suffers from a significant seizure disorder that requires him to take medication three times per day immediately following meals. If Tedder does not take his medication with food, he vomits violently. Moreover, Tedder's seizure condition causes him to experience dizziness several times per day. Therefore, SCDC doctors issued him a "pass" permitting him to sit down or lie down when he has bouts of dizziness and to use a cane. Additionally, Tedder suffers from asthma and takes prescription asthma medication.

Prescription medication is distributed at LCI via the "pill line" in the medical unit. LCI is divided into a "West Yard" and an "East Yard"; Tedder's unit is in the West Yard. LCI policy is to not have West Yard and East Yard inmates waiting in the pill line simultaneously because of previous altercations

---

[*] The record contains little information about the "assaultive disciplinaries" other than the name of the charged infraction, the disposition of the charge and the date of the underlying incident: 1) "Fighting without a weapon," convicted, 2009; 2) "Striking an employee," convicted, 2004; and 3) "Fighting without a weapon," convicted, 1996. J.A. 77.

between East and West inmates. However, there was evidence that this policy was not strictly enforced.

For about six months prior to August 28, 2009, Lieutenant Anthony Graham had been permitting Tedder to leave the mess hall immediately after his meal and go directly to the pill line regardless of whether the West Yard or East Yard was currently in line. Johnson had witnessed Tedder leave early for the pill line on numerous occasions. In fact, on several of these occasions, Johnson was working the "Plaza Gate" through which inmates must pass to join the pill line. Johnson often stopped Tedder from going through this gate until Tedder could show a pass or a superior officer confirmed that Tedder was permitted to pass.

On August 28, 2009, Tedder ate lunch and immediately proceeded to the pill line. Lt. Graham, who was in charge of the prison yard for the day, gave Tedder permission to enter the Plaza Gate in order to stand in the pill line. Lt. Graham indicated that he would tell Johnson, who was at the Plaza Gate, to let Tedder pass for his medication. When Johnson noticed Tedder in line to come through the Plaza Gate, however, he yelled that Tedder was not getting through and told Tedder to return to his unit. At the time, East Yard inmates were technically supposed to be in the pill line; witnesses, however,

noticed that inmates from both the East and West Yards were mingled together in the pill line.

Rather than immediately comply with Johnson's order to leave, Tedder told Johnson that Lt. Graham was going to call him to confirm that Tedder had permission to pass through the gate to get his seizure medication. And, in fact, Lt. Graham did contact Johnson via radio and instruct him to let Tedder pass through the gate. Nonetheless, Johnson repeated to Tedder, "you ain't coming through the gate," and Tedder again insisted that he had permission from Lt. Graham to enter. According to witnesses, Johnson became hostile with Tedder, telling him "No, cracker, you ain't coming through this gate" and "your cracker ass is not going to do nothing but go back to the Unit."

At this point, witnesses observed Tedder moving slowly and concluded that he was ill. Tedder informed Johnson, "I can't make it back to the dorm, I am too tired and too weak to make it to the dorm. I am going to lean against this here wall until I can make it to the dorm." Johnson reacted by poking Tedder's nose with his finger and yelling in his face, "You damn cracker, you're going to listen to me." Tedder tried to turn away from Johnson, but Johnson sprayed him in the face with approximately 14 ounces of pepper spray, causing Tedder to gasp for air, cough, gag, and vomit. According to inmates who watched the entire sequence of events, "[A]t no time whatsoever did Tedder

6

make any threatening moves towards Johnson or anyone else. At no time did Tedder verbally threaten anyone." J.A. 88. After discharging the pepper spray, Johnson grabbed Tedder and shoved him into the wall and then onto the ground. Tedder cursed at Johnson and asked Johnson, "Why the hell did you spray me?" Johnson then put his knee into Tedder's back and cuffed Tedder's hands behind him. When Tedder yelled that Johnson was hurting him, Johnson laughed.

Superior officers eventually arrived and directed Johnson to take Tedder to get cleaned up. Tedder was kept in a holding cell for a few hours and then released back to his unit. As a result of this incident, disciplinary charges for refusing or failing to obey a guard were lodged against Tedder. The charges were ultimately dropped.

Johnson's version of what occurred is different. According to Johnson, Tedder simply refused to obey and raised his cane at Johnson in a menacing fashion. Johnson believes that discharging chemical munitions in Tedder's face was required to maintain order as he was concerned that Tedder's unruly behavior might incite other inmates in the vicinity.

## II.

In the prison context, a claim that officials applied excessive force falls under the Cruel and Unusual Punishments Clause of the Eighth Amendment, which "protects inmates from

7

inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996); see Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008) (internal quotation marks omitted). "Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." Williams, 77 F.3d at 761.

The objective component focuses not on the severity of any injuries inflicted, but rather on "the nature of the force," which must be "nontrivial." Wilkins v. Gaddy, 130 S. Ct. 1175, 1179 (2010). The objective component can be met by "the pain itself," even if the prisoner has no "enduring injury." Williams, 77 F.3d at 762 (internal quotation marks omitted).

Regarding the subjective component, the key question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320-21 (1986) (internal quotation marks omitted); see Shreve, 535 F.3d at 239. In Whitley, the Court outlined factors to consider when deciding if the prison official acted wantonly or maliciously: (1) the necessity for the application of force; (2) the relationship between the need for force and the amount

8

of force used; (3) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them" at the time; and (4) the "efforts made to temper the severity" of the force applied. Whitley, 475 U.S. at 321.

The district court concluded that Tedder proffered insufficient evidence to satisfy the subjective component of his Eighth Amendment claim. Applying the Whitley factors, the court concluded that a reasonable jury could not conclude from the facts presented that the pepper spray was not used in good faith but maliciously. Specifically, the district court relied on the fact that Tedder did not comply with Johnson's orders to return to his unit. The court noted that in his affidavit, Johnson stated that the use of mace on Tedder was necessary to "restore order, prevent possible unrest among the inmates [in the immediate vicinity], and protect the safety of [Johnson], other inmates, and Tedder."

We disagree. As this appeal arises from a grant of summary judgment, we must view the record in a light most favorable to Tedder. Application of the Whitley factors would permit a trier of fact to conclude that Johnson sprayed Tedder wantonly and maliciously for the purpose of causing him harm. First, there is evidence suggesting that there was no need for the application of force at the time that Johnson applied it.

9

Johnson did not use the mace on Tedder until after Tedder indicated that he was "too tired and too weak to make it to the dorm," and was "going to lean against this here wall until [he] c[ould] make it to the dorm." J.A. 73. Witnesses stated that Tedder appeared visibly sick and that Tedder had not said or done anything threatening to Johnson, other guards or anyone else. Moreover, Johnson was well aware that Tedder had an actual medical problem for which he had routinely been given accommodation. Accordingly, when Johnson applied the pepper spray, Tedder had already indicated that he was not going to resist and would return to his unit when he was physically able to do so. Second, because the facts, viewed in Tedder's favor, permit the conclusion that no force was necessary at all, the Whitley "amount of force" factor favors Tedder as well.

In applying the third Whitley factor, we must consider the extent of any threat posed by Tedder to the staff or other inmates, as reasonably perceived by Johnson based on the facts known to him at the time. Johnson contends that he believed Tedder posed a threat because (1) Johnson "knew [Tedder] had a long history of serious and violent disciplinary infractions," and (2) Tedder raised his cane in a threatening manner and shouted expletives at Johnson. J.A. 42-43. Again, the record contains sufficient facts from which a trier of fact could conclude that Tedder posed no threat at all. First, it is

10

debatable whether Tedder had a "long history of serious and violent disciplinary infractions." Johnson's characterization of Tedder's disciplinary record is undercut by the fact that in more than 20 years of SCDC custody, Tedder has only been cited for three "disciplinaries" serious enough to be categorized as "assaultive." More importantly, nothing about the incident in question suggests that Tedder posed a threat. Tedder was visibly in a weak physical condition and also communicated to Johnson that he was too tired to walk back to his housing unit. This squared with Tedder's significant health problems of which Johnson was aware since he had observed LCI's accommodations to Tedder on several previous occasions. Furthermore, Tedder told Johnson that he would return when he had the strength to do so; thus, he made clear that he intended to obey Johnson. Finally, Tedder specifically denied raising his cane and witnesses indicated Tedder did nothing threatening during the incident. Tedder also denied cursing Johnson <u>before</u> getting maced.

Fourth, the facts suggest that Johnson did nothing to temper the severity of the force applied. Johnson points to the fact that he used only a small amount of mace, but given that none was required at all to force compliance from an inmate who was already complying and unable to resist, this factor is of no significant value to Johnson. In fact, after spraying Tedder,

11

Johnson took him down and handcuffed him despite Tedder's obvious distress.

Finally, Johnson ignored a direct order to allow Tedder to get his medicine, used racial epithets against Tedder throughout the incident, and laughed at Tedder's complaints. These facts provide a sufficient basis from which a trier of fact could conclude that Johnson acted maliciously.

We further conclude that Tedder created a genuine issue of material fact on the objective component of his Eighth Amendment excessive force claim. Tedder's adverse physical reaction to the pepper spray—gagging, breathing difficulty, and vomiting—establishes that the nature of the force Sgt. Johnson used against Tedder was nontrivial. See Danley v. Allen, 540 F.3d 1298, 1309 (11th Cir. 2008) (observing that pepper spray is designed to disable the person sprayed "by causing intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx" (internal quotation marks omitted)), overruled on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010).

Accordingly, the district court erred in concluding that Tedder failed to proffer sufficient evidence to establish that Johnson acted maliciously and sadistically in spraying Tedder with pepper spray. Johnson therefore cannot claim qualified

12

immunity because malicious and sadistic use of force for the very purpose of causing pain is always in violation of clearly established law. This is not an incorrect guess in a gray area of the law. See Shreve, 535 F.3d at 240 (denying qualified immunity to a prison guard because right to be free from excessive use of pepper spray was clearly established).

### III.

Johnson urges us to affirm the district court's summary judgment order on alternative grounds. See United States v. Smith, 395 F.3d 516, 519 (4th Cir. 2005) ("We are not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record."). Johnson contends Tedder failed to exhaust his administrative remedies prior to filing this action challenging prison conditions under federal law. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] . . . by a prisoner confined in any . . . correctional facility until such administrative remedies as are available are exhausted."). Exhaustion of available administrative remedies is mandatory and a prerequisite to suit. See Anderson v. XYZ Corr. Health Servs., Inc., 407 F.3d 674, 677 (4th Cir. 2005). However, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from

13

availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

Tedder filed a grievance regarding the pepper spray incident shortly after it occurred, but the grievance form was "closed without a decision on its merits," J.A. 55, on the ground that the incident being grieved was also the subject of a pending disciplinary charge. Under prison policy, a grievance could not be filed regarding an incident that was the subject of a disciplinary charge until after the charge had been resolved. J.A. 57. After resolution of the charge, the inmate had 15 days to file a grievance regarding the same subject matter. The disciplinary charges against Tedder based on the pepper spray incident were dropped. Tedder, however, did not re-file his grievance after resolution of the disciplinary charges.

Johnson contends that the administrative grievance process was available to Tedder as reflected by the fact that Tedder not only filed a grievance regarding this incident (albeit improperly) but filed multiple grievances during his time at LCI. Johnson argues that because Tedder understood how to file grievances, the grievance process was an administrative remedy available to him but unexhausted.

We cannot affirm the grant of summary judgment on this basis. At the summary judgment stage, Johnson has failed to establish that the evidence is so one-sided that no reasonable

14

factfinder could find that Tedder was prevented from exhausting his administrative remedies.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The record contains evidence suggesting that Tedder was prevented from availing himself of the grievance process in this particular instance because LCI's grievance coordinator Catherine James told Tedder that his grievance was exhausted and no further action was required before he could proceed to federal court. The record further contains evidence that Tedder was illiterate and therefore had no choice but to rely on this assurance from James.

Tedder states in his affidavit that after the disciplinary hearing which was resolved in his favor, officer James told him "that [his] grievances were exhausted, i.e. 'You can go to the street to court,' because it was after fifteen days from the incident."  J.A. 29.  In another affidavit, Tedder declared, "I was told by the head grievance officer, a female, that my grievance was done."  J.A. 74.  Moreover, James's official written response to Tedder's grievance, which was read to Tedder by another inmate, suggested that he could not pursue the merits of his excessive force grievance any further:

> When an inmate is involved in an incident that results in a disciplinary, that issue/complaint becomes non-grievable. Therefore, this complaint is being closed without a decision on its merit. Once you have been to your disciplinary hearing and if you feel that there were technical/procedural errors regarding your hearing, you may submit a grievance at that time.

15

J.A. 55 (emphasis added). This written response could be reasonably interpreted to mean that Tedder could file a grievance if there was a technical error at the <u>disciplinary hearing</u>. Since the disciplinary charges were dropped, Tedder would not have had reason to file a grievance with respect to his hearing. On this record, we cannot affirm summary judgment in favor of Johnson.

IV.

For the foregoing reasons, we reverse the district court's grant of summary judgment and remand for additional proceedings.

<u>REVERSED AND REMANDED</u>