Gary Neal SADLER, Plaintiff,

v.

S.K. YOUNG, et al., Defendants.

No. 2:00 CV 70581.

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

July 21, 2004.

Gary Neal Sadler, pro se.

Mark R. Davis and Joel C. Hoppe, Office of the Attorney General, Richmond, Virginia, for Defendants.

## OPINION AND ORDER

JONES, Chief Judge.

This is a prisoner's rights action filed under 42 U.S.C.A. § 1983 (West 2003), against Virginia state prison officials who completely immobilized the plaintiff for nearly forty-eight hours by strapping his wrists, ankles, and chest to a prison bed after he slapped his food tray onto a guard. A jury found for the defendants and the plaintiff has moved for judgment as a matter of law as to his Eighth and Fourteenth Amendment claims. While the initial restraint of the prisoner did not violate his rights, I find that his continued restraint was without legitimate purpose. Accordingly, I will grant the plaintiff's mo-

tion and afford him a new trial limited to the issue of damages.

## I

On April 2, 2000, while incarcerated at Wallens Ridge State Prison ("WRSP"), in Big Stone Gap, Virginia, Gary Neal Sadler "slapped" a food tray onto an officer as the officer attempted to deliver the tray to him. In response to this incident, WRSP officers immediately confined Sadler in five-point restraints and continued to keep him restrained for forty-seven hours and twenty minutes. Sadler was bound face-up to a prison bed by plastic restraints at his wrists, ankles, and across his chest. During his confinement, he was dressed in his undershorts, without a blanket or other covering. Sadler was temporarily released from the five-point restraints only six times during the nearly two days, for approximately fifteen minutes each time, to use the toilet and eat.

Sadler filed this § 1983 suit pro se claiming that his constitutional rights to be free of cruel and unusual punishment under the Eighth Amendment and to not be deprived of liberty without due process of the law under the Fourteenth Amendment were violated by the defendants. The four defendants are employed at WRSP.[1] David Allen Taylor is a correctional officer who recommended that Sadler be confined in five-point restraints and supervised his initial placement in them. John M. Eaton and Terry Givens are correctional officers who supervised Sadler's temporary releases from the five-point restraints. Stanley K. Young is the warden of WRSP and did not participate in the decision to restrain Sadler or to keep him restrained but is

---

1. Two WRSP nurses, Vicki Harber and Phyllis Hobbs, and a WRSP investigator, Michael E. Hutchinson, were also defendants, but Harber's and Hutchinson's motions for summary judgment were granted before trial and Hobbs' motion for judgment as a matter of law was granted at trial. Another defendant, D. Parlier, a correctional officer, was severed and granted a continuance because he had been called up on active military duty.

responsible for the overall operation of the institution. Young also reviewed the grievance Sadler filed after his release from confinement and determined that the officers had complied with prison policy.

Sadler was housed in a Connecticut prison at the time of the trial and represented himself via video conferencing. The jury was instructed as to liability and damage issues and returned a verdict for the defendants. Sadler thereafter moved in a timely fashion for judgment as a matter of law and a new trial.

I have reviewed the parties' briefs on the motions, the trial transcript, and the trial exhibits. The motions are now ripe for decision.

## II

Pursuant to Rule 50, a district court may grant a motion for a judgment as a matter of law after the jury has reached a verdict "[i]f ... there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving] party." *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir.1998); Fed.R.Civ.P. 50. The motion should not be granted unless, viewing the evidence in the light most favorable to support the jury verdict, "the evidence is so clear that reasonable men could reach no other conclusion than the one suggested by the moving party." *Persinger v. Norfolk & W. Ry. Co.*, 920 F.2d 1185, 1189 (4th Cir.1990). In considering a Rule 50 motion, this court cannot "weigh evidence or assess the credibility of witnesses." *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir.1985).

The evidence at trial, viewed in the light of the foregoing principles, shows as follows.

### A. The Events Leading to Sadler's Confinement in Five–Point Restraints.

Sadler is a Connecticut inmate who was temporarily incarcerated at WRSP.[2] On April 2, 2000, Sadler was housed in WRSP's segregation unit, which is under twenty-three hour lockdown.[3] Because an inmate in segregation is under lockdown, correctional officers deliver meals to him by sliding a food tray through a narrow slot in the cell door that can only be unlocked by the officers. Sadler testified that during the lunch service on April 2, he had observed Correctional Officer Young "taking something out of his mouth and putting it inside some food trays he was

---

2. Sadler was one of about five hundred Connecticut prisoners transferred to WRSP under a contract between the Virginia and Connecticut state governments in order to relieve prison crowding in Connecticut. The transfer was controversial in Connecticut, particularly after the deaths of two Connecticut inmates at WRSP. *See Young v. New Haven Advocate*, 315 F.3d 256, 259 (4th Cir.2002) (regarding Warden Young's libel suit against Connecticut newspapers). The Connecticut inmates have since been removed, following an inquiry by the Connecticut Office of Protection and Advocacy for Persons with Disabilities and a federal lawsuit in Connecticut. *See* Craig Timberg, *Connecticut Pulls Prisoners From Wallens Ridge*, Wash. Post, July 25, 2001, at B01. One of the allegations in the lawsuit involved the indiscriminate use of five-point restraints. *Id.*

3. Inmates can be placed in the segregation unit by a watch commander, if, for example, they receive an institutional infraction such as disobeying a direct order or if an inmate fears for his safety. Inmates confined in segregation receive fewer privileges, fewer recreational opportunities, and less room to move than inmates in general population. Within seventy-two hours of being placed in segregation, the inmate receives an Inmate Classification Authority ("ICA") hearing at which the warden reviews the decision to place the inmate in segregation and determines the appropriate length of confinement depending upon the infraction. The inmate then has the opportunity to make statements in his defense. The record does not reveal why Sadler was confined in segregation.

delivering to the inmates." (Tr. at 4.) Sadler said that he had informed Young that he would report him and that he did not wish to receive his lunch, but that Young had continued to slide the food tray into his cell's tray slot despite this request. Sadler told the jury that as he blocked the tray slot with his hands in order to prevent the meal from entering his cell, the tray fell back toward Young and spilled onto him. Young then closed and locked Sadler's tray slot and left.

Officer Young is no longer at WRSP and did not testify at trial, but he did record his account of the event in an incident report that day. In his report, he wrote that at approximately 11:30 a.m., when he had handed Sadler his food tray through the cell's tray slot, "Sadler came to the door and slapped his tray and food on me and the floor. The beans hit me from my face to my boots. Sgt. Davidson was notified immediately." (Pl.'s Ex. 3.) Officer Young was not injured during this incident. (Tr. at 67.)

Captain Taylor, the watch commander, was notified of the incident and recommended to his supervisor, Administrative Duty Officer ("ADO") Randy Phillips, that Sadler be placed in five-point restraints for three reasons: (1) He believed that the assault of Young with the food tray was deliberate; (2) he was informed that after the incident Sadler began "raising hell" verbally; and (3) in the past Sadler had attempted to assault an officer by jerking the officer's arm through his cell's food tray slot while the officer had been cuffing him.[4] (*Id.* at 70–71.) At trial, Taylor testified that he had neither witnessed Sad-

ler's verbal hell raising nor could he recall the nature of the threats that the officers had described to him. Pursuant to Taylor's recommendation, ADO Phillips ordered that Sadler be placed in five-point restraints and on restrictive feeding to prevent further staff assaults and ensure the safe and orderly operation of the unit.[5] Taylor testified that the purpose of placing Sadler in five-point restraints instead of leaving him in his cell had not been to punish him, but to ensure that he did not assault the staff. ADO Phillips did not testify at trial.

It is unclear how much time elapsed between Young's encounter with Sadler and Taylor's recommendation to place Sadler in five-point restraints. Young's Incident Report states that the tray incident occurred at approximately 11:30 a.m. Taylor's Serious Incident Report states that the incident occurred at approximately noon and that ADO Phillips was notified at 12:10 p.m. Sadler, however, testified that Young had not returned to his cell with Taylor and the other officers to restrain him for about an hour. Despite the ten-minute time lapse Taylor had indicated in his Serious Incident Report, at trial he testified that to the best of his recollection not more than five minutes had elapsed from the time that he had received the report of a disturbance until the time that he had arrived at Sadler's cell to restrain him.

At least eight officers, including Taylor, were involved in the process of physically restraining Sadler. Sadler complied with their orders to back up to the tray slot to

---

4. Sadler received disciplinary convictions at WRSP between January (when he first arrived at WRSP) and April 2000 twice for disobeying direct orders (refusing to open food slot and refusing to leave shower) and once for attempting to assault an officer (jerking officer's arm through food tray slot while being cuffed).

5. The institutional physician, Dr. Nwuache, approved the use of restrictive feeding on Sadler. (Pl.'s Ex. 3.) Sadler's placement on restrictive feeding was authorized by Warden Young on April 2, 2000, starting with his Sunday supper meal that day and ending with his Sunday supper meal on April 9. (*Id.*)

have his wrists cuffed, kneel on the floor to have leg irons placed on him, and be escorted to the restraint cell, where he was placed face-up on the restraint bed. One officer held an electronic shield over Sadler's chest as he lay on the mattress but did not activate it. Other officers removed Sadler's right ankle from the leg iron and secured it to the bed with a restraint, removed Sadler's left ankle from the leg iron and secured it to the bed with a restraint, removed Sadler's right wrist from the handcuffs and secured it to the bed with a restraint, and then removed Sadler's left wrist from the handcuff and secured it to the bed with a restraint. The chest strap was then secured. The five-point restraints were checked by Nurse Harber and found to be applied correctly. All staff then exited the cell and secured the cell door.

In his Serious Incident Report, Taylor reported that "[t]here was no use of force during this incident and no injury to staff or inmate." (Pl.'s Ex. 3.) Taylor's description in his Serious Incident Report is consistent with the less detailed incident reports filed by the seven other officers who participated in restraining Sadler. (*Id.*) Sadler fully complied with all of the officers' orders: He put his hands through the food slot so that he could be cuffed; he kneeled in his cell away from the door so that the officers could unlock the cell door, enter the cell, and shackle his ankles; he was peacefully escorted to the restraint cell by the officers; he permitted the officers to undress him down to his undershorts; he lay down on a plastic mattress in the restraint cell; and he did not resist while the officers placed him in five-point restraints by restraining his legs, wrists, and chest to the mattress. Once Sadler was secured in the five-points restraints, he was lying on his back on the mattress, wearing only his shorts, with his legs restrained to the bottom portion of the mattress, his arms restrained to the sides of

the mattress, and a restraint across his chest.

Sadler admitted at trial that he had yelled at the officers while they had restrained him, stating that he had done so "because I was frustrated with what they were doing to me, but at no time did I threaten them." (Tr. at 10.) Taylor testified that although Sadler had not physically resisted the officers during the restraining process, he had engaged in a "tirade," had "insinuated that we needed a riot there," had "made some sexual comments," and had asked "[me if I] had ever been shot with a real gun." (*Id.* at 84, 90, 62, 65–66.) The officers videotaped the application of restraints and that tape reveals that Sadler did not yell at the officers until he was at least partially secured in the five-point restraints. When he did yell, with a spit mask on most of the time, he said that the officers had lived a fortunate life because they had probably never been shot by a "real" gun, as people in his neighborhood had, and because they had probably never had a riot in their prison. The officers stood around Sadler while he made these comments, waiting for the nurse to arrive and examine him. At one point Captain Taylor responded, "You watch too much T.V."

Sadler testified that when he had asked the officers how long he was going to be restrained, they said that "the sergeant would come by whenever he wanted, or that [he] would be in the restraints for two days." (*Id.* at 11.)

B. *The Prison's Policy on the Use of Five–Point Restraints.*

The Commonwealth of Virginia's policy on the "Use of Restraining Devices" at correctional facilities at the time that Sadler was restrained permitted the restraint of an inmate solely for security purposes and only by the authorization of the War-

den or the ADO.[6] (Pl.'s Ex. 1 at 3.) The policy provided that "[a]ny restraints applied within a cell should be removed if the inmate's dangerous or disruptive behavior has subsided and it has been determined [that] the inmate no longer poses a threat to himself or others." (*Id.*) The policy prohibited the use of restraints beyond forty-eight hours "without the express approval of the Deputy Director, Division of Field Operations." (*Id.*) It mandated that restrained inmates be partially or completely released from restraints at meal times and for toilet use a minimum of four times during each twenty-four hour period, including prior to each meal, and that restrained inmates be observed at fifteen minute or more frequent intervals by institution staff as directed by the physician or qualified mental health professional.[7] Correctional officers were required to prepare written documentation stating the reason for the application of restraints, the dates and times of observations, the dates and times observed by medical staff, and the dates and times when the inmate was partially or totally released from restraints.[8]

According to the defendants' responses to the plaintiff's interrogatories, the ADO had final authority in placing inmates in or releasing them from restraints. Watch commanders, sergeants, and lieutenants could only make recommendations on whether an inmate should be released from restraints. Verbal abuse without accompanying indications of a security threat did not constitute cause to place an inmate in restraints. (Pl.'s Ex. 6 at No. 5.)

Correctional sergeants and lieutenants were normally in charge of temporary releases of inmates from five-point restraints. The sergeant or lieutenant would directly supervise correctional officers during the release and ensure that it was filmed and documented. The supervisor was responsible for providing the inmate with a meal, if scheduled, as well as access to appropriate medical staff, conducting the release in a manner to prevent injury to staff or the inmate, and documenting the release in an incident report.

At trial, Sadler presented evidence of seventeen cases between January and June 2000 in which WRSP inmates were confined in five-point restraints for approximately forty-eight hours.[9] (*See* Pl.'s Ex. 4 at Encl. A.) According to Warden

---

**6.** Although the policy specifically refers to "four-point restraints" and does not refer to "five-point restraints" or "humane restraints" (a term the defendants' witnesses often used at trial to refer to five-point restraints) it was apparently understood by the officers at WRSP that this policy also governed the use of five-point restraints. Four-point restraints are less restrictive than five-point restraints because they secure wrists and ankles, but not the chest.

**7.** The policy was changed in October 2000 to specify a total of seven temporary breaks from restraints, although it did not specify how many hours may pass between breaks. (Pl.'s Ex. 5 at No. 7.)

**8.** A log indicates that Sadler was checked by a correctional officer every fifteen minutes between 12:05 p.m. on April 2 and his release at 11:25 a.m. on April 4. (Pl.'s Ex. 3.)

**9.** During the three months prior to Sadler's confinement in restraints, between January and April 2, 2000, there were eight occasions in which WRSP inmates were confined in five-point restraints for approximately forty-eight hours though they did not engage in any dangerous or disruptive behavior while being placed in restraints or during their temporary releases. These are the cases in which inmates were so confined: Victor Velasco was placed in five-point restraints for forty-eight hours and ten minutes, from January 18, 2000 at 6:10 p.m. to January 20, 2000 at 6:20 p.m.; B. Jocelyn was placed in five-point restraints for forty-eight hours and thirty-five minutes, from January 24, 2000 at 5:20 p.m. to January 26, 2000 at 5:55 p.m., and for forty-seven hours and thirty minutes, from March 7, 2000 at 8:45 a.m. to March 9, 2000 at 8:15 a.m.; R. Luciano was placed in five-point restraints for forty-eight hours and forty minutes, from January 26, 2000 at 7:25 a.m. to January 28, 2000 at 8:05 a.m.; A. Griffin

Young's responses to interrogatories and his testimony at trial, there were eight incidents in which inmates who were restrained between January and April 2, did not engage in any dangerous or disruptive behavior while placed ·in five-point restraints or during any of their temporary releases, yet they were restrained for a total of approximately forty-eight hours. (*Id.*; Tr. at 144–47.) In five of the seventeen incidents the inmate engaged in dangerous or disruptive behavior upon being placed in five-point restraints, but did not engage in any dangerous or disruptive behavior during any temporary release from five-point restraints, yet they were restrained for approximately forty-eight hours. (Pl.'s Ex. 4 at Encl. A; Tr. at 144–47.) Indeed, one confinement lasted over seventy-two hours even though the inmate did not engage in any dangerous or disruptive behavior during the temporary releases. (*Id.*)

According to Warden Young's responses to interrogatories introduced at trial, no WRSP officer had been disciplined or reprimanded for misusing five-point restraints prior to April 2, 2000. (Pl.'s Ex. 2 at No. 12.) At trial, over three years after that date, Warden Young testified that he was "not aware of any occasion where the review ha[d] demonstrated a failure of the individuals in charge to follow procedures." (*Id.* at No. 14.)

### C.  The Duration· of Sadler's Confinement.

Sadler was placed in five-point restraints under Captain Taylor's supervision on April 2, 2000, at 12:05 p.m. (Pl.'s Ex. 6 at 1.) He was temporarily released under Sergeant Parlier's supervision on April 2 at 9:12 p.m., under Sergeant Eaton's supervision on April 3 at 7:30 a.m., 1:10 p.m., and 5:30 p.m., under Sergeant Givens' supervision on April 3 at 11:45 p.m., and again under Sergeant Eaton's

was placed in five-point restraints for forty-five hours and ten minutes, from February 17, 2000 at 10:00 p.m. to February 19, 2000 at 7:10 p.m., for forty-five hours and fifty minutes, from March 28, 2000 at 10:10 a.m. to March 30, 2000 at 8:00 a.m.; F. Adorno was placed in five-point restraints for fifty-two hours and thirty-one minutes, from February 8, 2000 at 12:50 a.m. to February 10, 2000 at 5:21 a.m.; and D. Bonner was placed in five-point restraints for forty-six hours and fifty minutes, from February 9, 2000 at 9:25 a.m. to February 11, 2000 at 8:15 a.m. (Pl.'s Ex. 4 at Encl. A.)·

From April 2, to June 2000, there were three additional occasions in which inmates were confined in such a way: Trini Davis was placed in five-point· restraints for forty-eight hours and thirty-two minutes, from April 16, 2000 at 10:11 p.m. to April 18, 2000 at 10:43 p.m.; T. Donovan was placed in five-point restraints for forty-eight hours and thirty-five minutes, from June 17, 2000 at 7:05 a.m. to June 19, 2000 at 7:40 a.m., and for seventy-three hours and twenty-eight minutes, from June 21, 2000 at 7:02 p.m. to June 24, 2000 at 8:30 p.m. (*Id.*)

In five of the seventeen cases of confinement presented by Sadler, the inmate en-

gaged in dangerous or disruptive behavior upon being placed in five-point restraints, but did not engage in such behavior during any of his temporary releases, even though he remained confined for approximately forty-eight hours. These are the cases in which inmates were restrained in such a way: Benjamin Cruz was placed in five-point restraints for forty-nine hours and twenty minutes, from January 12, 2000 at 4:50 p.m. to January 14, 2000 at 6:10 p.m.; T. Donovan was placed in five-point restraints for forty-six hours and fifty minutes, from February 26, 2000 at 7:13 p.m. to February 28, 2000 at 6:03 p.m., for forty-eight hours and twenty-three minutes, from May 31, 2000 at 7:05 p.m. to June 2, 2000 at 7:28 p.m., for seventy-three hours and twenty minutes, from June 21, 2000 at 7:02 p.m. to June 24, 2000 at 8:30 p.m.; and K. Ibrahim was placed in five-point restraints for forty-five hours and forty minutes, from January 10, 2000 at 5:20 p.m. to January 12, 2000 at 3:00 p.m. (*Id.*)

The average length of confinement in five-point restraints in these seventeen cases was forty-nine hours and nineteen minutes. (*Id.*)

supervision on April 4 at 7:50 a.m. (*Id.*) Sadler was permanently released from five-point restraints on April 4 at 11:25 a.m. under Sergeant Eaton's supervision. (*Id.*) Therefore, he was confined in five-point restraints for a period of forty-seven hours and twenty minutes, including the release intervals.

At trial, Warden Young testified that the prison policy on restraints had permitted the warden or ADO to order the restraint of inmates in order to protect themselves or others, to prevent escapes, or to maintain control of the inmate. He testified that he knew that the policy had required that the inmate be removed from restraints if his dangerous or disruptive behavior had subsided and if it had been determined that the inmate no longer posed a threat to himself or others. Young testified that neither the incident reports nor the videotape of the temporary releases provided him with enough information to assess whether it had been appropriate to confine Sadler in five-point restraints for forty-seven hours and twenty minutes.

In an interrogatory response introduced at trial, Young submitted that at the time of Sadler's restraint, possible alternatives to the use of five-point restraints had included the use of the disciplinary process, restrictions on inmate privileges, cell restriction, cell reassignments, and intermediate restraint procedures. Young also contended that his officers "do not use five-point restraints where the situation can be satisfactorily be [sic] handled through other means." (Pl.'s Ex. 2 at No. 15.) Ambulatory restraints are an intermediate restraining procedure in which a chain is fastened around the inmate's waist that connects to handcuffs and leg irons. Ambulatory restraints permit an inmate to walk and use his arms, but in a severely restricted manner. Young testified that ambulatory restraints had not been utilized as a less forceful alternative to five-point restraints at the time of Sadler's confinement because inmates so restrained were still able to throw fluids at the guards through cracks at their cell doors. That policy has changed and ambulatory restraints are now an option at WRSP because those cracks have since been sealed. Young also testified that the policy regarding the use of ambulatory restraints had been modified in response to changes in the prison's security level and in the staff's qualifications and experience.[10]

Taylor testified at trial that he had recommended that Sadler be placed in five-point restraints because he felt that Sadler had reached a "state of mind" that made him "dangerous at that moment." (Tr. at 74.) Taylor said that after he had made the recommendation and after ADO Phillips had ordered Sadler's confinement in five-point restraints, he provided Sadler with the opportunity to tell his side of the story. (Tr. at 80–81.) However, there is no mention in Taylor's Serious Incident Report or in the other officers' shorter incident reports that Sadler had the opportunity to speak with Taylor and defend himself either before his initial confinement in restraints or at any time after he was secured in them. (*See* Pl.'s Ex. 3.)

Taylor testified that he had not possessed the authority to release Sadler from the restraints, but as the shift commander it had been his duty to view Sadler twice a day to ascertain whether the continued application of restraints was necessary and to make a recommendation to the ADO, which the ADO would probably follow. Taylor testified that he had called the unit supervisor to check on Sadler before his

---

10. At the time of Sadler's restraint, WRSP had been open only one year and over sixty-two percent of the staff were new and inexperienced hires.

shift ended at approximately 3 p.m. on April 2, three hours after Sadler was first restrained, and was advised that Sadler was still yelling at staff. He therefore decided not to recommend his permanent release at that time. Taylor was not on duty for the remainder of Sadler's confinement.

Eaton supervised Sadler's temporary releases at 7:30 a.m., 1:10 p.m., and 5:30 p.m. on April 3, and his final release at 11:25 a.m. on April 4. Parlier was Eaton's supervisory officer and was present during these releases, but was unavailable to testify at trial because he was on active military duty. Eaton testified that his records did not indicate that Sadler either verbally abused or physically resisted the officers, yet he did not make a recommendation to the ADO or watch commander as to whether it was necessary to keep Sadler restrained. Eaton said that he did not have the authority to permanently release an inmate from restraints, that the ADO did, but he did not recall whether the ADO had been present during the temporary releases.

Givens supervised Sadler's temporary release on April 3 at 11:45 p.m., and testified that Sadler had made a threatening comment as the restraints were being removed:

> [Sadler] had made verbal threats [when informed that he was to be temporarily released and] before we brought [him] up off the five points such as, 'I'll get even,' or, 'Pay backs are hell.' That's what [he] made the statements to before we brought [him] up off the restraints.

(Tr. at 107.) Givens did not list this alleged verbal threat in his incident report form because he did not think it was appropriate to do so:

> I felt it was inappropriate [to include the verbal threat in my Incident Report] because in the five point restraints there was nothing I felt like he could do at the time. He was no threat unless he was being brought up from the five points, or being placed in them. Verbal threats, he's made those ever since he's been at Wallen's Ridge State Prison. He makes those all the time, sir.

(*Id.* at 109.) Givens testified that after having released Sadler he had helped him to regain his balance and "even allowed [him] to go to the back of the cell and exercise slightly away from my officers .... There were no physical restraints.... [He was] walking and doing [his] own thing." (*Id.* at 110.) When at trial Sadler asked Givens whether he had resisted the officers, Givens testified, "No. You didn't resist anybody," and, "No, you were not fighting in any way. You were not physically trying to hurt anyone that I know of." (*Id.* at 109–10.)

Givens said that as shift supervisor, he did not have the authority to permanently release Sadler from the restraints, but he did not directly respond to the question of whether he could recommend that Sadler be released from restraints, except to say that if Sadler had any physical needs he would have notified the appropriate authorities. Like Eaton, Givens did not provide the ADO with an assessment on whether it was necessary to keep Sadler restrained.

The incident reports completed by Parlier, Eaton, and Givens and reviewed and signed by their respective watch commanders, Lieutenant Lester, Captain Hockett, Lieutenant Reynolds, and Lieutenant Combs, of Sadler's temporary releases from five-point restraints state that no force was used on Sadler during any of the releases and do not indicate any form of misconduct or resistance on Sadler's part. (Pl.'s Ex. 3.)

### D. Sadler's Release.

Sadler was permanently released from confinement in five-point restraints on

April 4, 2000, at approximately 11:25 a.m. At trial, having reviewed the records pertaining to Sadler's confinement in restraints and Investigator Hutchinson's investigation of it, Warden Young could not explain how it was determined that Sadler no longer needed to be restrained or who made that determination, although he "assume[d] it was Mr. Phillips, the administrative duty officer that week." (Tr. at 163–65.)

After his release, Sadler filed a grievance with Warden Young, who determined that Sadler's claims were unmerited and the policy concerning the use of restraints had been followed. (Tr. at 25.) Sadler was charged with an "Assault on any Person," received a hearing, and was convicted of assaulting Officer Young with a food tray. (Pl.'s Ex. 3.)

### E. Sadler's Complaints of Pain and Injury.

Sadler claimed that upon arriving at the restraint cell he had smelled human waste and had seen urine and feces on the restraint mattress. Taylor, however, testified that the restraint cells had been cleaned by inmates on a daily basis, and that he had checked Sadler's restraint cell and had not seen any human waste in it.

Sadler testified that he had suffered immense physical pain throughout the two days of confinement. He said that his body "[had] hurt as if [he] had been beaten," that his chest had burned, and that he had asked the officers to allow him to use the toilet but they had refused. (Tr. at 10–11.) He testified that he had urinated on himself a few times and had been left to shiver from the wetness and cold while the officers had walked by his cell door laughing at him. (Id. at 11, 21.)

Sadler said that he had suffered mental pain while restrained:

It was like a mental thing.... When I got put back into the restraints [after a temporary release,] I had the urge to want to move, and my body would hurt even more because I couldn't move. When I got up ... [the pain] wouldn't be as bad, same thing when I had to use the bathroom. There was times I might have got up, and I didn't feel like I had to use the bathroom, and when I was put back in the restraints, almost immediately I had to use the bathroom.

(Id. at 9.) He said that throughout his confinement he had suffered from hallucinations that bugs were crawling on his body. (Id. at 14.) He also claimed that he had been unable to sleep for even one hour of his nearly two-day confinement because the ceiling light above him had remained on at all times.

Sadler testified that he had difficulty standing and walking each time the straps were removed:

I could barely stand up or walk because my body was ... hurting. I guess my muscles had relaxed or something. My entire body was hurting, especially my wrist. Now, my feet, my feet were hurting as if, you know, as if, as if I had been laying on them too long and I had a numb feeling when I got up and tried to walk.

(Id. at 12–13.) He said that he had been so weak and in pain during these releases that he could not get up by himself and the officers had to grab him by his arms to stand him up. Sadler claimed that during the releases the officers had refused his requests to wash off the urine that had dried up on him or clean it from the plastic restraint mattress. He testified that during these breaks he had been able to sit up and eat his meals while one wrist and both ankles remained strapped to the bed, but had been in pain while doing so.

When Sadler was permanently released from the five-point restraints, the officers had to assist him because he was unsteady. Givens testified that most inmates have

difficulty standing when initially released from restraints, but will regain their mobility after a few minutes. In his opinion, Sadler's instability upon being released was not unusual. Warden Young, however, testified that he believed that Sadler had acted deceptively before the camera. Young explained, "Normally [inmates] are ... stiff [when released from forty-eight hours of confinement in five-point restraints], but as far as the not being able to walk, can't stand up, can't sit up, that is not a normal ... reaction for an individual his age." (*Id.* at Vol. 2 p. 21.)

Sadler claimed that in between his fourth and fifth temporary releases, between 5:30 p.m. and 11:45 p.m. on April 3, he had felt his chest continue to burn, had suffered from hallucinations, had urinated and defecated on himself, and had vomited on himself due to the foul stench while the officers had walked by laughing at him. He said that during the 11:45 p.m. break, the officers had turned his mattress over because it was soiled with his vomit and waste, but had refused his requests to clean the waste and vomit off of himself. At the end of the temporary release, they had confined him face-down on his stomach to prevent him from choking on his vomit.

Givens supervised Sadler's fifth temporary release at 11:45 p.m. on April 3, and he testified that he had checked the cell and filmed the floor and mattress and did not see any evidence of vomit. This testimony is inconsistent with Givens' incident report which states that "Sadler was throwing up and [therefore] placed face down" when returned to restraints. (Pl.'s Ex. 3.) However, at trial Givens explained that what he had meant to write in his report was that Sadler had claimed that he had vomited but that there was no evidence to support his claim. (Pl.'s Ex. 3; Tr. at 116.) Givens testified that his officers had turned the mattress over because

it was wet from Sadler's profuse sweating and that they had restrained him face-down due to the medical staff's instruction to do so as a precautionary measure. (Tr. at 112, 115–16.)

Sadler testified that since being confined in restraints he suffers from nightmares and becomes agitated and claustrophobic when placed in small spaces, as whenever he is shackled, handcuffed, and transported.

Sadler claimed that his left wrist had been injured by tight handcuffs a few days before his confinement in five-point restraints, and that injury had been aggravated by his initial placement in the restraints. He testified that when he had complied with the officers' orders to lie on his back on top of his cuffed wrists while they restrained his legs, the combination of his own body weight with the pressure of a large shield that an officer had held over him caused further injury to his left wrist. When this happened, he had yelled out in pain. After having successfully restrained his legs, the officers had uncuffed his wrists in order to strap them to the sides of the mattress, at which point Sadler had seen that his wrists had been bruised and were bloody and swollen. After he was fully restrained, the officers called in Nurse Harbor, who briefly checked Sadler's wrists for injury and found none. The prison's medical records, including the regular examinations by nurses while Sadler was restrained, also do not indicate that Sadler's left wrist was ever injured. An X-ray report dated May 4, 2000, stated that Sadler's left hand was normal, and that the smaller bones of the wrist were intact. (Pl.'s Ex. 3.)

### III

Sadler claims that the officers' application of force violated his rights protected by the Eighth Amendment.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. It "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir.1996). "Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny .... After incarceration, only the 'unnecessary and wanton infliction of pain' ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (citations omitted).

■ In order for Sadler to show that he was subjected to cruel and unusual punishment while incarcerated, he must prove both that the officers "acted with a sufficiently culpable state of mind" (the subjective component) and that "the deprivation suffered or injury inflicted on [him] was sufficiently serious" (the objective component). *Williams* at 761.

The subjective component requires the plaintiff to show that the force was not "applied in a good faith effort to maintain or restore discipline," but was applied "maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Whitley*, 475 U.S. at 321, 106 S.Ct. 1078. The factors considered in determining whether the officers acted maliciously and sadistically for the purpose of causing harm to the inmate are: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 6–7, 112 S.Ct. 995; *Whitley* at 321, 106 S.Ct. 1078. "The absence of serious injury is ... relevant to the Eighth Amendment inquiry, but does

not end it." *Hudson* at 7, 112 S.Ct. 995. "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley* at 321, 106 S.Ct. 1078. *See also Williams*, 77 F.3d at 761–62.

The objective component addresses whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Hudson* at 8, 112 S.Ct. 995. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9–10, 112 S.Ct. 995 (citation omitted). The issue of whether the force applied is "repugnant to the conscience of mankind" is "contextual and responsive to contemporary standards of decency." *Id.* Therefore, to prove the objective component, a plaintiff must either show that the officials' use of force was more than de minimis or, in the alternative, that it was repugnant to the conscience of mankind.

### A

■ The first Eighth Amendment issue is whether the officers used unconstitutionally excessive force in initially confining Sadler in five-point restraints.

*Williams v. Benjamin*, 77 F.3d 756 (4th Cir.1996), is the single Fourth Circuit case addressing an excessive force challenge to the use of restraints. In *Williams*, the prison officials were confronted with Williams and five other inmates who were throwing liquids out of the food service windows of their cells. *Williams* at 759. The prison officials responded by first in-

structing the six inmates to stop and then macing them, which resulted in the prisoners immediately ceasing their actions. *Id.* While Williams hollered in pain from the mace, the officers imposed four-point restraints on him. *Id* at 760. Williams was left in four-point restraints for more than eight hours without being provided the opportunity to wash the mace from his eyes or body or to use the toilet. *Id.* Williams claimed to have "suffered with great difficulty and immense pain while inhaling the chemical munitions" left in his cell from the mace. *Id.* Williams appealed the district court's decision granting summary judgment to the defendants on his excessive force and due process claims to the Fourth Circuit. *Id.* at 760–61.

The first factor to be considered in assessing an official's intent is the need for the application of force. As the *Williams* court explained, "the necessity of the guards' actions is not the proper focus of the inquiry. Instead, we focus on whether the evidence supports the inference that the guards wantonly punished [the inmate]." *Id.* at 763–64 (citations omitted). The court held in *Williams* that it could not "conclude that there was no 'need' for the application of force or that the guards were unreasonable in their apparent belief that the imposition of four-point restraints was necessary to obtain 'order and control'" because "only minutes had elapsed since the disturbance had begun, Williams was still 'hollering,' and it was not obvious that the disturbance had ended." *Id.* at 764.

Considering the evidence in the light most favorable to the defendants, the decision to place Sadler in five-point restraints was made, according to Captain Taylor's testimony and Serious Incident Report, approximately five to ten minutes after Sadler had "slapped" a tray at Officer Young. Additionally, when Taylor approached Sadler's cell to restrain him, he was informed by other officers that Sadler had "raised hell" verbally with them before his arrival. For these reasons, it was not obvious that the disturbance had ended. As for the third factor, the threat reasonably perceived by the responsible officials, it was not unreasonable for the officers to have perceived a threat from Sadler considering that he had just slapped a tray onto one officer during a routine feeding and then proceeded to yell at the other officers.

In *Williams*, the Fourth Circuit combined its analysis of the second and fourth factors—the relationship between the need for force and the amount of force used and any efforts made to temper the severity of a forceful response—and found that the "imposition of such restraints is seemingly a not uncommon 'next' step, if verbal commands, show of force, and mace, are ineffective in controlling prisoners." *Id.* at 764. Warden Young reported that a few alternatives to five-point restraints were available at the time, including the disciplinary process, restrictions on inmate privileges, cell restriction, cell reassignment, and intermediate restraint procedures. (Pl.'s Ex. 2 at No. 15.) Cell reassignment was not an option because Sadler was already in segregation. Instead, the officers combined the disciplinary process and restrictions on inmate privileges along with the application of five-point restraints to control Sadler by charging him with attempted assault and placing him on restrictive feeding. (Pl.'s Ex. 3.) As for intermediate restraints, Warden Young testified that the use of ambulatory restraints, which are less severe than five-point restraints, had not been utilized by WRSP at that time because an inmate confined in ambulatory restraints could have still thrown fluids at guards through an unsealed crack at the cell door.

It was reasonable for the officers not to use ambulatory restraints in this case. Although there is no indication that Sadler had thrown liquids at any officer, he had slapped a tray and food onto an officer. It was thus reasonable for the officers to believe that ambulatory restraints, leaving at least one hand free to throw food, liquids, or other items at the officers, would not effectively control the situation.

It is settled that prison officials must be granted great deference in controlling potentially dangerous inmates. *Hudson*, 503 U.S. at 6, 112 S.Ct. 995. Without considering whether Sadler has met the objective component of the Eighth Amendment violation, I find that he has not sufficiently proved the subjective element of such a violation because a reasonable jury could find that the officers' decision to initially confine Sadler in restraints does not support the inference that they wantonly punished him.

## B

The next issue is whether confining Sadler in five-point restraints for forty-seven hours and twenty minutes violated the Eighth Amendment's prohibition of cruel and unusual punishment.

After due consideration of the record, I hold that no reasonable jury could find that Sadler's conduct necessitated an application of force for nearly forty-eight hours. There is simply no evidence indicating a need for continued restraint after 3 p.m. on April 2, three hours after Sadler was initially placed in five-point restraints. Taylor testified that Sadler had yelled at the officers who had restrained him and had continued to yell three hours later, at 3 p.m. However, there is no evidence that Sadler continued to yell after that time. Indeed, the uncontradicted evidence shows that the remainder of Sadler's confinement in restraints was uneventful. Sadler was temporarily released six times during his nearly two-day confinement to eat and use the toilet, and each of the six incident reports signed by defendants Eaton, Givens, and Parlier, who supervised and assisted in these temporary releases, states that Sadler fully complied with their orders and that there was no need to apply force during the releases. (*See* Pl.'s Ex. 3.) Neither the testimony nor the reports suggest any reason for keeping Sadler restrained for nearly two days.

Even when Sadler made a threatening comment to Givens, Givens did not perceive him as a threat because he felt Sadler made such comments all the time. Givens testified that during Sadler's fifth temporary release at 11:45 p.m. on April 3, Sadler had said either, "Pay backs are hell," or, "I'll get even," as he was being "brought up from the restraints," but he told the jury that had chosen not to record the statement in his Incident Report because "[Sadler had] made [verbal threats] ever since he's been at Wallen's Ridge State Prison. He makes those all the time." (Tr. at 107, 109.) In spite of Sadler's comment, Givens testified that he had "allowed [Sadler] to go to the back of the cell and exercise slightly away from [the] officers [without physical restraints]." (*Id.* at 110.) Instead of using this freedom to execute his threat to get even, according to Givens, "[Sadler] didn't resist anybody" and "[was] not fighting in any way [or] physically trying to hurt anyone." (*Id.* at 109–10.) Construing Givens' testimony in the light most favorable to the defendants, I find that it does not provide a reasonably sufficient basis on which to find that Givens perceived Sadler as a threat because Givens said that Sadler made such comments "all the time" and he was so unintimidated by the comment that he not only continued to temporarily remove the restraints, but he also indulged Sadler with the additional freedom to exercise while officers were present in his cell.

In *Williams,* the Fourth Circuit explained that "when . . . prison administrators initially apply force in a good faith effort to maintain discipline, '[h]ow long restraint may be continued calls for the exercise of good judgment on the part of prison officials.'" 77 F.3d at 765. But the court cautioned that "[d]eference to prison administrators does not give them constitutional license to torture inmates." *Id.* It held that there are limits to how long a prisoner can be constitutionally restrained, even if the initial restraint was in good faith: "[When] the immediacy of the disturbance [i]s at an end . . . the unnecessary infliction of continued pain throughout a prolonged time period clearly supports an inference that the guards were acting to punish, rather than to quell the disturbance." *Id.* at 765 (citing *United States v. Cobb,* 905 F.2d 784, 789 (4th Cir.1990) ("[P]unitive intent behind a defendant's use of force may be inferred when the force is not reasonably related to a legitimate nonpunitive governmental objective.") (quotations omitted)).

The absence of evidence of a need to restrain Sadler for nearly two days indicates that the defendants were executing a forty-eight hour punishment of Sadler as opposed to responding to an immediate disturbance. The policy on the use of restraints permitted the application of restraints only for security purposes and required that the restraints be removed "if the inmate's dangerous and disruptive behavior ha[d] subsided and it ha[d] been determined [that] the inmate no longer pose[d] a threat to himself or others." (Pl.'s Ex. 1 at 3.) Sergeants and lieutenants could make recommendations to the ADO, who commanded the final authority to release an inmate from restraints if his dangerous and disruptive behavior had subsided. (Pl.'s Ex. 5 at No. 5.) Although neither Eaton nor Givens perceived Sadler to be a threat, both sergeants failed to recommend his release to the ADO or even their watch commanders, who also could have presented a recommendation to the ADO. At trial, both Eaton and Givens testified that they had lacked the authority to permanently release inmates from five-point restraints, but neither explained why they had not at least recommend Sadler's release, a recommendation that the policy had empowered them to make. I find that Taylor, however, acted in good faith in keeping Sadler restrained and not recommending his release to the ADO before leaving his shift at 3 p.m. on April 2, because he reasonably perceived Sadler to be a threat due to the recency of the tray incident and his continued yelling three hours later.

Although in *Williams* the Fourth Circuit explained that a failure to comply with prison policy on the use of restraints "would not mean that [the plaintiff] would automatically prevail on his Eighth Amendment claim," *id.* at 766 n. 5, in this case Eaton's and Givens' failure to comply with the policy evidences their wanton intent. It proves that even though they repeatedly recorded in their incident reports that Sadler's temporarily releases were uneventful, they failed to report to the ADO or watch commander that the need to restrain him had long passed.

The prison policy on the use of restraints prohibited the application of restraints beyond forty-eight hours "without the express approval of the Deputy Director." (Pl.'s Ex. 1 at 3.) There is no evidence, other than speculation by Warden Young, confirming that anyone actually made a determination to permanently release Sadler. (*See* Tr. at 164–65.) Instead of a determination to release Sadler once his dangerous and disruptive behavior had subsided, Sadler was kept restrained until further restraint would have demanded the inconvenience of seeking express approval from the Deputy Director.

The only reasonable inference is that the de facto policy at WRSP was to keep inmates restrained for forty-eight hours regardless of whether they continued to engage in dangerous or disruptive behavior, as further evidenced by the eight documented incidents in which WRSP officers continued to apply five-point restraints for approximately forty-eight hours on inmates who had not engaged in any dangerous or disruptive behavior during the restraining process or any of the temporary releases.

For these reasons, I hold as a matter of law that the remaining defendants did not act in good faith in restraining Sadler for forty-seven hours and twenty minutes because there is no reasonably sufficient evidentiary basis showing that the defendants perceived Sadler to be a threat after 3 p.m. on April 2, three hours after he was first restrained. At some point, an inmate's continued restraint without evidence of its necessity is unconstitutional. It is not necessary to determine at what point Sadler should have been released—whether it was immediately after he stopped yelling or after the first, second, or third temporary release was completed without incident—only that forty-seven hours and twenty minutes was too long and that his confinement for that period of time had no legitimate purpose.

I also find that there are two grounds on which Sadler has established the objective component of his excessive force claim. First, any reasonable jury would find that completely immobilizing an inmate in five-point restraints for nearly forty-eight hours constitutes more than de minimis pain, even when the inmate is temporarily released for six approximately fifteen minute periods, and regardless of whether there is proof that the inmate suffered any lasting injury. In *Williams,* the Fourth Circuit noted that "[m]ankind has devised some tortures that leave no lasting physical evidence of injury" and "[f]or this reason, courts should be wary of finding uses of force that inflict 'merely' pain but not injury to be *de minimis,* and therefore beyond requiring justification under the Eighth Amendment." 77 F.3d at 762, 762 n. 2. The physical and mental pain Sadler suffered while his arms, legs, and chest were restrained for forty-seven hours and twenty minutes, including the breaks, is more than sufficient to meet the objective component of a prisoner's excessive force claim. Second, any reasonable jury today would find that confining an inmate in five-point restraints for nearly two days with short breaks is the sort of force that is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 995.

## IV

■ Sadler claims that the defendants violated his rights protected by the Due Process Clause of the Fourteenth Amendment.[11]

Liberty interests can arise from two sources, the Due Process Clause itself and state law. *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Due Process Clause may create a liberty interest when the restraint imposed upon an inmate exceeds her sentence in an "unexpected manner." *Id.*

11. The defendants assert that the pro se plaintiff's complaint failed to state a cause of action or facts supporting a cause of action under the Due Process Clause. Although the plaintiff did not cite the legal bases for his claims in his complaint, he did allege facts sufficient to state a due process claim, specifically that he had been punished without justification. (Compl. at D.) Regardless, the defendants do not claim that any inadequacy in the plaintiff's pleadings harmed them. In fact, the defendants' brief on the present motion fails to assert any defenses to the due process claim that the defendants did not present at trial. (*See* Defs.' Br. Opp'n at 11–13.)

State prison rules may also create liberty interests that are protected by the Due Process Clause when they "impos[e][an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484–86, 115 S.Ct. 2293 (holding that prisoner has no state-created liberty interest in being free from segregated confinement because it does not constitute an atypical, significant deprivation).

In *Williams,* the court acknowledged that the inmate's transfer from administrative segregation to "[t]otal immobilization in [four-point] restraints surely 'work[ed] a major disruption in his environment.'"[12] 77 F.3d at 759, 769–70 (quoting *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293). Although the court rejected the plaintiff's due process argument for other reasons, it held that an inmate has a "liberty interest" in not being confined in four-point restraints:

> Simply because the initial application of the restraints occurred soon after a disturbance does not mean that four-point restraints may be imposed indefinitely. At some point in time, an inmate so restrained would be entitled to some procedural protection to ensure that his liberty interest was not being arbitrarily and capriciously denied. In this appeal, we decline to resolve where that point exists.

77 F.3d at 770 n. 10. Therefore, the Fourth Circuit has held that inmates have a "liberty interest" in not being "arbitrarily and capriciously" confined in four-point restraints, though it has yet to determine at what time protection of that liberty interest is due.

In order to determine whether Sadler possessed a liberty interest protected by the Due Process Clause, I must "compare the conditions to which [he was] exposed in [the five-point restraints] with those [he] could expect to experience as an ordinary incident of prison life." *Beverati v. Smith,* 120 F.3d 500, 503 (4th Cir.1997). Being completely immobilized in five-point restraints for almost forty-eight hours is unlike the administrative segregation or the denial of work release situations that the Fourth Circuit has held do not invoke due process protections. *Kitchen v. Upshaw,* 286 F.3d 179, 185–87 (4th Cir.2002) (holding that Virginia law does not provide prisoners with a constitutionally protected liberty interest in work release because there is nothing atypical about being denied permission to leave jail in order to work); *Beverati,* 120 F.3d at 502–04 (holding that administrative segregation does not impose an atypical and significant hardship on prisoners). The "ordinary incidents of prison life" do not include strapping an inmate's wrists, ankles, and chest to a bed for nearly two days with six short breaks to eat and use the toilet. Even though Sadler was already in the segregation unit and therefore had fewer privileges, fewer recreational opportunities, and less room to move than inmates in general population, his immobilization here constitutes a serious departure from even the ordinary incidents of life in segregation.

I find that there are three grounds on which Sadler may maintain his due process claim. First, the application of five-point restraints on Sadler for almost forty-eight

---

**12.** In considering the plaintiff's due process claim, the *Williams* court also looked for mandatory language in the applicable prison policy and consent decree. *See* 77 F.3d at 769. It is not necessary to do so here because since *Williams,* the Fourth Circuit has abandoned the mandatory language requirement. *See Kitchen v. Upshaw,* 286 F.3d 179, 185–86

(4th Cir.2002) (stating that the *Sandin* court had "reconsidered its reasoning" as to the mandatory language requirement); *Beverati v. Smith,* 120 F.3d 500, 503 n. 3 (4th Cir.1997) (finding that the *Sandin* court had "retreat[ed] from the mandatory language approach").

hours, including the six temporary releases, posed an atypical and significant hardship on him; I therefore hold that he has a state-created liberty interest protected by the Due Process Clause. Second, Sadler also possesses a state-created liberty interest as a matter of law because (as the Fourth Circuit held in *Williams*) "[a]t some point in time" the imposition of four-point restraints, which are less restrictive than five-point restraints, entitles the inmate to "some procedural protection to ensure that his liberty interest was not being arbitrarily and capriciously denied." Third, I hold that the Due Process Clause by its own force also provides Sadler with procedural protection because confinement in five-point restraints for nearly forty-eight hours exceeds a prisoner's sentence in an "unexpected manner."

As a matter of law, no reasonable jury could disagree that the defendants violated Sadler's right to due process by failing to provide him with any process during his confinement. It is not necessary to determine the exact moment during the two days when the defendants should have provided Sadler with procedural protection or what kind of procedure was necessary. In *Williams*, the Fourth Circuit stated that "at some point in time" a restrained inmate is "entitled to some procedural protection to ensure that his liberty interest was not being arbitrarily and capriciously denied." That the defendants Eaton and Givens were present throughout Sadler's lengthy confinement and did not provide him *any* process during the nearly forty-eight hours that Sadler was safely secured in the restraints is enough for any reasonable jury to find a violation. Because Taylor was only on duty during the first three hours of Sadler's confinement, and because Sadler was not entitled to process during that time, I will deny Sadler's Fourteenth Amendment claim against Taylor.

The defendants argue that if Sadler had a right to due process, he received it because Taylor gave him the opportunity to tell his side of the story before he was restrained and because he received a disciplinary hearing after his release in which he was convicted of assaulting Officer Young. (Defs.' Brief Opp'n at 12–13.) I find that these procedures are irrelevant to Sadler's right to have received procedural protection at some time during his confinement to ensure that the remainder of his confinement was not arbitrary and capricious. It should also be noted that ADO Phillips had ordered Sadler's confinement before Taylor gave Sadler the opportunity to tell his side of the story, thus rendering that opportunity to defend himself futile.

The reasons the *Williams* court provided for denying the plaintiff's due process claim are not present here. In *Williams*, the court rejected the inmate's due process argument for three reasons: First, the inmate had not made an argument as to what sort of procedural protections were required; second, process was not possible because the restraints were imposed in response to a disturbance; and third, the inmate had not alleged that his post-deprivation state remedies were inadequate. *Williams* at 769–70. None of these points is relevant here because they speak to the situation in which the inmate seeks process before initial placement in restraints, whereas I merely hold that Sadler was entitled to process at some point during his nearly two days of confinement in five-point restraints. The holding in this case departs from the *Williams* court's holding that a restrained inmate is "entitled to some procedural protection" "[a]t some point" only by holding that the point had passed by the time the restraint had ended.

■ The defendants claim that they are entitled to qualified immunity from liability for Sadler's due process claim. The qualified immunity defense "[shields] government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It was clearly established in 2000, by the Supreme Court's opinion in *Sandin v. Conner*, that inmates have a liberty interest in freedom from restraint that imposes an atypical and significant hardship on them. *See* 515 U.S. at 484. Furthermore, the Fourth Circuit's opinion in *Williams v. Benjamin* clearly provides an inmate confined in four-point restraints "to some procedural protection to ensure that his liberty interest was not being arbitrarily and capriciously denied." Because *Sandin* and *Williams* were clearly established constitutional standards at the time of the offense, the defendants are not entitled to qualified immunity on the plaintiff's procedural due process claim.

## V

■ Warden Young claims that he is not liable for any constitutional violations arising from Sadler's confinement in five-point restraints because he was not involved in the decision to restrain him or to keep him restrained. (Defs.' Br. Opp'n at 16.)

Supervisory officials may be held liable for the actions of their subordinates under § 1983 if the plaintiff can show: (1) that the supervisor had actual or constructive knowledge that his subordinates were engaged in conduct that posed "a pervasive and high risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indif-

ference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Randall v. Prince George's County, Md.*, 302 F.3d 188, 206 (4th Cir. 2002); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994).

A "pervasive" and "unreasonable" risk of harm requires evidence that the subordinates' "conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate[s] poses an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799. Deliberate indifference may be established by showing the supervisor's "continued inaction in the face of documented widespread abuses." *Id.* Such inaction provides "an independent basis for finding [the supervisor] either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." *Id.* Causation may be direct, "where the policy commands the injury of which the plaintiff complains," or proximate, pursuant to the tort principle that "holds a person liable for the natural consequences of his actions." *Id.*

In *Slakan v. Porter*, 737 F.2d 368 (4th Cir.1984), the plaintiff filed suit against prison officers and their supervisors because the officers had used high-pressure water hoses against him while in a one-man cell. 737 F.2d at 371. First, the court found that the plaintiff had established that the warden had knowledge of the officers' pervasive conduct because the warden testified that he knew that high-pressure water hoses had been used against inmates housed in one-man cells on seven occasions in the year preceding the attack on the plaintiff, he had personally approved such a use on one other occasion, a guard testified that the warden permit-

ted the practice, and there was evidence that the warden had opposed state-proposed regulation of the use of high-pressure water hoses in the past. *Id.* at 373–74. Second, the court determined that the warden was deliberately indifferent to the officers' use of high-pressure water hoses because despite his knowledge, "he failed to offer adequate guidance to his subordinates concerning the appropriate use of such techniques." *Id.* at 374. Third, the plaintiff showed an affirmative causal link between the warden's indifference and the application of force on him because the incident he experienced was a "natural and foreseeable consequence of the supervisors' indifference." *Id.* at 376.

In the present case, no reasonable jury would doubt that Warden Young knew that his subordinates were engaged in conduct that posed "a pervasive and high risk" of constitutional injury to inmates. At trial, Sadler presented evidence of eight cases between January and April 2, 2000, in which WRSP inmates were placed in five-point restraints for approximately forty-eight hours although they had not engaged in any dangerous or disruptive behavior while being placed in the restraints or during any temporary release from them. Each time a prisoner is placed in five-point restraints, the warden reviews the corresponding Serious Incident Report to determine whether procedures were properly followed. (Pl.'s Ex. 2 at No. 14.) Warden Young testified that he had reviewed the reports in these eight cases. (Tr. at 147.) Therefore, according to Warden Young's own testimony, he had knowledge of at least these eight incidents in the three months preceding Sadler's confinement in which his officers continued to apply five-point restraints for approximately forty-eight hours on inmates who had not engaged in any dangerous or disruptive behavior during the restraining process or the temporary releases.

Second, any reasonable jury would find that Warden Young's response to the knowledge that his officers were abusing the restraining process was so inadequate as to show deliberate indifference to or tacit authorization of their practice. Although he testified to reviewing incident reports cataloguing cases where officers continued to confine inmates in restraints without reporting any evidence that the inmate continued to pose a threat during or after the application of restraints, he did nothing. In fact, in response to the plaintiff's interrogatories, Warden Young said that no WRSP officer had been disciplined or reprimanded for misusing five-point restraints prior to April 2, 2000. (Pl.'s Ex. 2 at No. 12.) The warden did not provide evidence that he took any action in response to evidence of the officers' widespread abuses. As did the warden in *Slakan*, Warden Young has implicitly admitted that he knew of, but did not act upon, evidence that his officers were using excessive force in restraining inmates.

Third, any reasonable jury would find a causal link between Warden Young's inaction and Sadler's constitutional injuries. Had Warden Young taken action, for example, by reprimanding those officers who had unnecessarily restrained inmates for lengthy periods of time, or providing restrained inmates with the opportunity to explain why they should be released, then he may have prevented the further misuse of five-point restraints and Sadler would not have suffered an excessive use of force without justification and punishment without the benefit of process.

## VI

Prison officials face difficult challenges. Prisons may be dangerous places, both for inmates and staff. It is right that we give prison administrators considerable leeway in handling disruptive inmates. Neverthe-

less, any society based on the rule of law must impose limits on the treatment of those convicted of crime. The uncontradicted evidence presented at trial shows that the officials here crossed that line. Inmate Sadler may deserve to be in prison, but he did not deserve under the facts of this case to be tied to a bed for nearly two days. Accordingly, and for the reasons set forth in this opinion, it is **ORDERED** that the plaintiff's motion for judgment as a matter of law is granted as to the liability of defendants Young, Eaton, and Givens, and denied as to defendant Taylor. The court will schedule a jury trial limited to the question of damages as to defendants Young, Eaton, and Givens.